Alberta GILINSKY, Plaintiff,

v.

COLUMBIA UNIVERSITY in the City of New York, William Peterson, Chairman, Board of Trustees, Columbia University, William J. McGill, President, Dean George Fraenkel, Dean of Graduate Faculties, Professor Julian Hochberg, Chairman, Department of Psychology, Columbia University, Defendants.

No. 73 Civ. 4211.

United States District Court, S. D. New York.

April 28, 1980.

As Corrected May 2, 1980.

See also, D.C., 440 F.Supp. 1120.

Armand Gilinsky, New York City, for plaintiff.

Cahill, Gordon & Reindel, New York City, for defendants; Joel C. Balsam, James P. Blake, New York City, Carol Kroch, of counsel.

LASKER, District Judge.

Alberta Gilinsky sues Columbia University and several of its officials (collectively, Columbia) on behalf of herself and all other women similarly situated. She alleges that she was denied appointment as a visiting professor of psychology for the academic year 1972–73 and as a tenured professor for the following year in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981, Execu-

tive Order 11246, and the Fifth and Fourteenth Amendments.

Gilinsky's individual action was first tried before the New York State Division of Human Rights. Commissioner Sable found that Columbia had not discriminated against Gilinsky because of her sex. His finding was eventually upheld by the New York Court of Appeals. 39 N.Y.2d 612, 385 N.Y.S.2d 19, 350 N.E.2d 396 (1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977). The record of the state proceedings was admitted into evidence at the trial of this action during which additional testimony was taken.[1]

### I. The Fifth and Fourteenth Amendment Claims

Columbia moved at the close of the presentation of Gilinsky's case to dismiss the claims under the Fifth and Fourteenth Amendments on the grounds that the requisite state action had not been proven.[2]

Gilinsky argues that state action is present under the analysis set forth in *Weise v. Syracuse University*, 522 F.2d 397, 407 (2d Cir. 1975) (quoting *Jackson v. Statler Foundation*, 496 F.2d 623, 629 (2d Cir. 1974)). The rule set forth in *Weise* is that:

"[F]ive factors [are] to be weighed in considering state action claims:

(1) the degree to which the 'private' organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a 'private' organization in associational or other constitutional terms."

---

1. References to the testimony taken at this trial is indicated by "Tr." and to the state proceedings by "St. Tr."

 Gilinsky seeks to admit into evidence certain documents identified as Plaintiff's Exhibits 37, 62–62(h), 63–63(d), 83, 92, and 101(a). Al-

though the documents are admissible, Columbia is correct that they lack probative value.

2. Columbia also moved at trial to dismiss Gilinsky's claims under 42 U.S.C. § 1981 and Executive Order No. 11246. These motions were granted. Tr. 86.

Gilinsky argues that she has met the demands of this formula because (1) Columbia receives substantial federal and state financial funding and grants; (2) Columbia is subject to state laws prohibiting sex discrimination; (3) the state has tacitly approved Columbia's discriminatory practices; (4) Columbia provides college and university courses; and (5) Columbia has harmed the public by committing the wrongs alleged here.

 The only factor arguably present here is the first, the receipt of financial assistance. As to the others, merely being subject to the laws of the State or the United States is clearly insufficient to show that action in violation of those laws is state action. Similarly, "tacit" approval by the State does not convert action by a private party into state action. By providing higher education, Columbia may place itself before the public eye and attain a measure of public influence, but it does not thereby act as a surrogate of the State in the performance of its educational mission. Indeed, in today's market, it is a competitor in the sale of its services with such institutions as the City University of New York and the State University of New York.

As to Columbia's receipt of public funds, it is unnecessary, for the purpose of determining whether its action is state action, to scrutinize the degree to which it is dependent on federal and state funding. Without a showing that the State or federal government was " 'involved . . . with the activity that caused the injury,' " government support is insufficient to establish state action. *Weise v. Syracuse University,* supra, 522 F.2d at 405 (quoting *Powe v. Miles,* 407 F.2d 73, 81 (2d Cir. 1968)). As noted by Judge Frankel in another case involving Columbia,

> "receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government. Otherwise, all kinds of contractors and enterprises, increasingly dependent upon government business for much larger proportions of income than those here in question, would find themselves charged with 'state action' in the performance of all kinds of functions we still consider and treat as essentially 'private' for all presently relevant purposes."

*Grossner v. Trustees of Columbia University,* 287 F.Supp. 535, 547–48 (S.D.N.Y.1968).

Accordingly, the motion to dismiss the claims under the Fifth and Fourteenth Amendments is granted.

## II. The Class Claim

Columbia moved at trial to dismiss the claim of discrimination against the class[3] arguing that hiring statistics establish that the Department of Psychology has not discriminated against women since Title VII became applicable to Columbia in 1972.

Gilinsky bases the class claim "upon Columbia's own statistics and documents to prove the pattern or practice of disparate treatment of women in hiring by the Psychology Department both pre- and post-Act." (Letter from Plaintiff's Attorney, November 7, 1979). Those statistics, which are both pre- and post-1972, show that as to tenured faculty, the Psychology Department had no tenured women until it appointed one in academic year 1977–1978, and that that appointment raised the percentage of tenured women in the department from zero to nine. As to nontenured faculty, in 1972, the Department had one woman out of a total of six (or 16.66%) nontenured professors, compared to 28% women at Columbia's "Feeder" School Pool, and in 1978, two out of seventeen nontenured faculty appointments were women.[4]

---

3. The class certified in this action consists of "all women qualified for teaching positions in the Psychology Department and who have been, or may in the future be denied employment because of their sex."

4. These statistics are taken from the letter from plaintiff's attorney of November 7, 1979, p. 4.

However, the statistics to which the parties stipulated show that in academic year 1977–1978, two out of six nontenured faculty and one out of eleven tenured faculty (total of three out of seventeen tenured and nontenured) were women. Proposed Joint Pre-Trial Order ¶ 22.

These statistics are obviously heavily influenced by the pre-1972 hiring practices of the department since the only post-1972 statistics on which Gilinsky relies are cumulative, and represent the net result of hiring practices that extended well before 1972.

■ However, the probative value of pre-1972 statistics is at best minimal. Since the 1972 amendments to Title VII making it applicable to educational institutions did not alter substantive rights retroactively, *Weise v. Syracuse University, supra,* 522 F.2d at 411, prior to that time "[Columbia] University was free, as far as Title VII was concerned, to discriminate in its employment practices." *Id.* at 410.

As the Supreme Court stated in *Hazelwood School District v. United States,* 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977) (footnote omitted),

> "A public employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes."

The Court clarified the weight to be given to pre-1972 statistics:

> "This is not to say that evidence of pre-Act discrimination can never have any probative force. Proof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decisionmaking process had undergone little change."

*Id.* at 309 n. 15, 97 S.Ct. at 2742 n. 15.

■ Here it is stipulated that since the date Title VII became effective as to Columbia five out of the nine faculty appointments made by the Psychology Department have gone to women, including one out of the two tenured appointments.[5] Proposed Joint Pre-Trial Order ¶ 24. The statistics simply do not establish that the Department has engaged in a pattern or practice of discrimination against women as a class in the period since it has been covered by Title VII of the Civil Rights Act of 1964. Rather they create a presumption that the Department has not discriminated against women and Gilinsky has shown no other evidence (such as a heavy preponderance of applications from women) that would rebut that presumption.

Accordingly, the motion to dismiss the class action is granted.

## III. Gilinsky's Individual Claim

■ The parties agree that Gilinsky's individual claim is controlled by *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and that to prove her prima facie case, she must show

> "(i) that [s]he belongs to a [sexual] minority; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

*Id.* at 802, 93 S.Ct. at 1824 (footnote omitted). If Gilinsky proves a prima facie case of sex discrimination, the burden then shifts to Columbia to articulate a nondiscriminatory reason for its failure to hire her, and Gilinsky then bears the burden of demonstrating that this reason is pretext. *Id.*

---

5. Gilinsky relies on pre-1972 statistics to support her claim of class-wide discrimination. As the Supreme Court noted in *Hazelwood,* pre-Act statistics are not irrelevant and may be offered to support the inference that discrimination prior to the act has continued. 433 U.S. at 309 n. 15, 97 S.Ct. at 2742 n. 15. However, given the overwhelming evidence refuting the claim that since 1972 the Department discriminated against women, even if such an inference could be drawn, it would not support a finding of class discrimination.

Gilinsky also argues that the "attrition" rate of women faculty members of the department is 40%. Without proof that Columbia is responsible for this fact, as, for example, by causing its female faculty members to leave its employ involuntarily, Columbia cannot be held liable.

## A. Prima Facie Case

 There is no dispute that Gilinsky belongs (in this case) to a sexual minority or that, despite her qualifications, she was "rejected" for appointment. However, for reasons indicated below, we find that she has not proven the second and fourth *McDonnell* elements. She contends that the appointment of Donald Hood to a tenured position in the Department of Psychology two years after her application was rejected establishes both that Columbia was seeking to fill the same position for which she applied and that the position remained open after her rejection. Columbia answers that Hood was appointed because (1) his area of expertise was in physiological psychology—an area the department needed to build at the time, while Gilinsky's was in sensation and perception, (2) he had held a nontenured position in the department for five years, and (3) he was rated as more qualified than Gilinsky by outside evaluators.

### 1. The Second McDonnell Element

Gilinsky contends that she has demonstrated that Columbia was seeking applications from professors *with her qualifications* by establishing that she applied at the suggestion of Professor Herbert Terrace, a member of the personnel search committee for the department of psychology (Tr. 66, 74; St. Tr. 61–62), that a vacancy existed in the department (St. Tr. 685–86), and that she was qualified to fill that position as demonstrated by her curriculum vitae (Plaintiff's Exhibit 30).

However, that a member of the department's search committee suggested she apply in 1968 does not establish that Columbia was seeking applications from professors for the 1971–1972 academic year at issue here. In fact, the evidence shows otherwise. First, the parties have stipulated that no recommendations for tenured positions were made for the 1972–1973 and 1973–1974 academic years and no appointment to the position of visiting professor was made for the 1972–1973 academic year (Proposed Joint Pre-Trial Order ¶¶ 20, 21).

Second, the evidence establishes that the department was not seeking to make a tenured appointment either of someone from outside Columbia or in the area of Gilinsky's expertise sensation and perception. Dr. Julian Hochberg, chairman of the department during academic years 1972–1973 through 1973–1974 (Tr. 95) testified:

"[W]e neither felt we should nor in fact that we could make any tenured appointments from outside in any of those areas [of social personality and sensation perception].

(Tr. 154). His statement is supported by documentary evidence, including the minutes of a meeting of the Executive Committee of the Psychology Department on April 11, 1972 (St. Tr. 689), a letter from John A. Nevin, Chairman of the Psychology Department to Dr. George K. Fraenkel, Dean of the Graduate School of Arts and Sciences dated June 4, 1971 (Defendants' Exhibit XX) and another letter to Dean Fraenkel from Nevin and Hochberg dated June 14, 1972 (Defendants' Exhibit ZZ), both of which outline the anticipated needs of the department. The 1972 letter states:

"As far as tenured positions are concerned: Tenured appointments drawn from outside the University are not presently anticipated in the Social-Personality area, nor in Sensation-Perception."

(p. 2), indicating a position that had not shifted over the previous year:

Our present areas of strength are learning, perception and cognition, and social psychology. We also have some strength in sensory psychology and physiological psychology. It is our judgment that we must maintain our strength in all these areas, with the exception that we should not appoint another sensory psychologist to replace Clarance Graham when he retires."

(Defendants' Exhibit XX, p. 7).

Moreover, when a tenured position became vacant, the department's policy at the time was, for financial reasons, to make non-tenured appointments (Tr. 108, 157). Indeed, the very document (a memorandum from the Office of the Dean to the Depart-

ment of Psychology dated November 24, 1971) to which Gilinsky points as establishing the existence of the vacancy created by the death of Professor Clarence Graham specifies that

"The appointment should be made at the beginning associate-professor level, either by promotion from the non-tenure ranks or by appointment from outside the University. It is not anticipated that authorization for this appointment can take effect before the 1974–75 academic year."

(St. Tr. 685). Clearly, the department was not seeking to appoint a tenured professor from outside the University whose specialization was in the area of sensation and perception.

Gilinsky argues that the decision of the department, as evidenced by the minutes of the meeting held on her application (which record discussion to the effect that the department did not need her because it was sufficiently strong in sensation and perception) (St. Tr. 689–91) was an attempt to "pigeon hole" her into a field narrower than her capability. The evidence shows that the department had sought to expand its strength in the area of physiological psychology. As articulated by the 1971 and 1972 department chairmen,

". . . appointments in the following areas are needed either for maintenance of strength or to fill some need for support: Physiological . . ."

Letter from John A. Nevin and Julian Hochberg to Dean Fraenkel, June 14, 1972, p. 2 (Defendants' Exhibit ZZ), and

"[W]e should make two assistant professor appointments in areas that seem to us to hold great promise for the immediate future, and/or meet certain teaching needs.

1. Human infancy. . . .

2. Quantitative methods and computer models. . . .

3. If it becomes possible to make an additional appointment, we should strengthen the area of physiological psychology currently represented by Woods and Hood."

Letter from John A. Nevin to Dean Fraenkel, June 4, 1971, pp. 7–8 (Defendants' Exhibit XX). Two years after Gilinsky's application was rejected, Donald Hood, whose expertise was in physiological psychology (Tr. 127–28; Hood's curriculum vitae, Defendants' Exhibit 000–1) was appointed to tenure (Proposed Joint Pre-Trial Order . 23). Gilinsky contends that she was capable of filling that position, but she has offered no evidence to counter Hochberg's testimony (Tr. 163), which is supported by her curriculum vitae (Plaintiff's Exhibit 30), that her area of specialization was sensation and perception.

It is true that Gilinsky believed herself to be qualified. During her cross examination, the following exchange occurred:

"Q Dr. Gilinsky, if a university or an institute was looking for someone with expertise in physiological methods as well as perhaps knowledge elsewhere, but really looking for knowledge and expertise in physiological matter, would you consider yourself a candidate to teach graduate students?

A Yes. As a matter of fact I will be teaching a course in physiological methods next term.

Q Despite the fact you have never done any published work or experiments which I specifically asked you, in the area of physiology, that you would be capable of teaching advanced graduate students in that area?

A Yes.

Q What would qualify you to do that? If someone were looking at your vitae, what would they look to then, to perceive that you were qualified to teach these physiological methods?

A I think there are three answers to your question. One is my very large breadth of experience and knowledge and ability to learn quickly so the techniques which I haven't had hands-on experience, I would be able to very quickly learn and become skillful at. That's number one."

(Tr. 57–58). However, that the members of the psychology department considering Gilinsky's application declined to draw the

suggested inference that Gilinsky was qualified to teach physiological methods to graduate students is not surprising. The argumentation by Gilinsky does not refute Hochberg's testimony, which is supported by Gilinsky's curriculum vitae, that Gilinsky's area of specialization at the time was in perception and sensation. (Tr. 163; Plaintiff's Exhibit 30).[6]

## 2. The Fourth McDonnell Element

As to the fourth *McDonnell* element, Gilinsky argues that the appointment of Donald Hood to a tenured position in the department establishes that the position for which she applied remained open and subsequently was given to a man. However, as indicated above, the evidence shows that Hood was a specialist in physiological psychology (Tr. 126–28) which, as just discussed, Gilinsky was not. Moreover, Hood had held a non-tenured position in the department since 1969 (Proposed Joint Pre-Trial Order ¶ 23), teaching graduate students courses in physiological methods (Tr. 128), which was an area the department wanted to build (Tr. 129; Defendants' Exhibit XX, p. 8). Thus, the position filled by and the status of Hood—that of a professor of physiological psychology drawn from within the department—met the department's needs and requirements while the position for which Gilinsky applied and was qualified and her status did not.

Although we find that Gilinsky was not "qualified" (within the meaning of *McDon-nell*) for the position to which Hood was appointed, that finding does not diminish the impression made by Gilinsky's testimony at trial and her curriculum vitae that she is eminently qualified as a university level professor of psychology.

## B. Columbia's Nondiscriminatory Reason

Since Gilinsky has not proven a prima facie case, it is unnecessary to inquire further into Columbia's reasons for appointing Hood instead of her to a tenured position. Nevertheless, even if Gilinsky had satisfied her prima facie burden of proof, Columbia has established a nondiscriminatory, legitimate reason for its decision, and Gilinsky has offered no evidence that the decisional basis was a pretext for discriminatory motives. The same reason for concluding that the position to which Hood was appointed was not one for which Gilinsky was qualified supports the conclusion that Columbia's reasons for appointing Hood were nondiscriminatory, that is that it preferred to appoint a professor who had worked in the department since 1969 teaching graduate students and working in an area which the department wanted to build rather than a professor from outside Columbia who had not demonstrated an expertise in that area. Furthermore, the opinions solicited from outside Columbia on Hood's candidacy were unanimously favorable, and, when comparing him to Gilinsky, rated him as a better candidate.[7]

---

6. Gilinsky's curriculum vitae contains an impressive list of achievements, including her teaching, research, consulting and editorial experience, her membership in scientific and professional societies, research grants, the offices and committees she has served, and her articles and papers that have been published and delivered, which reveal a specialization in sensation and perception.

7. Since the names have been redacted, those who were asked to rate Hood, reference to their letter responses will be made to the documents' identification letter.
 The rater in Defendants' Exhibit VVV rated Hood first of three under both "Investigators of the same age" and "Older Investigators," and third among "Full Professors," while Gilinsky was ranked seventh in the latter group.

The rater in Defendants' Exhibit WWW ranks Hood "higher than any of the others" and compares him to Gilinsky:
 "Of the names you list as well established people, I don't understand the inclusion of Alberta Galinsky [sic]. I think Hood's contributions to the field already exceed hers."
The rater in Defendants' Exhibit XXX stated that "in my opinion Hood definitely ranks above Gilinsky."
The author of Defendants' Exhibit YYY "rate[d] him ahead of . . . Gilinsky."
Finally, the rater in Defendants' Exhibit ZZZ stated:
 "As for the senior people, I do not think of . . . or Gilinsky as Physiological Psychologists."

We conclude that Columbia did not discriminate against Gilinsky because of her sex in refusing to appoint her to a visiting or tenured position in the department of psychology, and accordingly the complaint is dismissed.

It is so ordered.