Nicola TAVOLONI, Plaintiff,

v.

**MOUNT SINAI MEDICAL CENTER,
et al., Defendants.**

**No. 97 CIV. 2967(LAK).**

United States District Court,
S.D. New York.

Nov. 14, 1997.

As Corrected Nov. 24, 1997.

Michael A. Hardy, Ethan Leonard, Scheurer, Wiggin & Hardy, New York, NY, for Plaintiff.

Carla A. Kerr, Derek J.T. Adler, Hughes Hubbard & Reed LLP, New York, NY, for Defendants.

## OPINION

KAPLAN, District Judge.

This case calls upon the Court to revisit a field that, for the most part, has lain fallow since the era of widespread campus unrest that attended the Vietnam war—the circumstances in which the actions of a private educational institution amount to state action for purposes of 42 U.S.C. § 1983 and the Constitution, albeit in the context of personnel action taken with respect to a faculty member rather than disciplinary action taken against allegedly disruptive students.

Plaintiff, a professor of medicine at the Mount Sinai School of Medicine, claims that he has been constructively discharged by Mount Sinai and that the school has violated his rights under the First, Fifth and Fourteenth Amendments in addition to federal statutes and state law. The defendants just as stoutly maintain that the federal claims all are without merit because, among other reasons, Mount Sinai is not a state actor and

that the pendent state law claims also should be dismissed.

### Facts

As will appear in greater detail below, the complaint asserts broadly that the Mount Sinai School of Medicine ("Mount Sinai")[1] cut plaintiff's salary substantially and otherwise subjected him to harassment, all in violation of his First, Fifth and Fourteenth Amendment rights. 42 U.S.C. §§ 1983 and 1985(3), the Employee Retirement Income Security Act ("ERISA"). and principles of contract law. Plaintiff proceeds on the theory that Mount Sinai "is part of the New York City University system ..."[2] This indeed is the only allegation of state action in the complaint.

### Procedural Posture

The defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) on the ground that it fails to state a claim upon which relief may be granted. However, they dispute the assertion that Mount Sinai is part of the City University and have submitted an affidavit of Barbara Barish, who is Mount Sinai's Vice President, Academic Administration, in support of their contention that Mount Sinai is not a state actor for purposes of this action. Accordingly the Court notified the parties, as authorized by Rule 12(b), that it would convert the motion, insofar as it involved the state action issue, into a motion for summary judgment and consider the Barish affidavit and the exhibits thereto. It afforded the plaintiff an opportunity to submit any additional evidentiary material. Plaintiff responded with a letter from counsel, which sought an opportunity for discovery and reargued the motion at length, but submitted no additional evidence. Accordingly. that portion of defendants' motion which asserts that the complaint must be dismissed because there is no state action is considered according to the standard governing motions for summary judgment. The remainder of the complaint is assessed by

---

**1.** The defendants, in addition to Mount Sinai, are Dr. Paul D. Berk, M.D., who is chief of the division of liver diseases in its department of medicine, and the Mount Sinai Medical Center, which is alleged to be the parent entity of Mount Sinai.

**2.** Cpt¶ 26. *Accord, id.* ¶¶ 7, 35.

the standard governing motions to dismiss for legal insufficiency.

*Plaintiff's Factual Allegations*

Plaintiff Nicola Tavoloni has been affiliated with Mount Sinai since 1980 and became a tenured professor in 1990.[3] It is undisputed that Dr. Tavoloni, during the early years of his affiliation with Mount Sinai, was a successful and, perhaps, distinguished researcher in the field of liver disease.[4] He contends, however, that Dr. Paul D. Berk, M.D., chief of the division of liver disease in the department of medicine, the division in which Dr. Tavoloni worked, began to disrupt his research endeavors and to harass plaintiff in 1992.[5] The alleged problem, which appears to have begun with disputes concerning laboratory facilities, festered.[6] According to the complaint. Dr. Berk informed plaintiff in early 1995 that plaintiff's salary would be cut if he did not obtain a new research grant.[7] Plaintiff rejoined that such action would be illegal and caused his counsel to approach the chairman of the department of medicine.[8]

In the summer of 1996, plaintiff submitted a new grant application. which was signed both by Dr. Tavoloni and on behalf of Mount Sinai, to the National Institutes of Health ("NIH"). Although plaintiff's salary at the time allegedly was about $75,000 per annum, the document stated that his base salary was $109,584.[9] Plaintiff alleges that Mount Sinai indicated to him that his salary would be restored to that level if the grant were forthcoming.[10]

The dispute reached its pre-litigation height in early 1997 when plaintiff's salary was cut to about $48,000 per annum, which plaintiff—although still employed by Mount Sinai—asserts constituted a constructive discharge from his tenured position.[11] He claims also that Dr. Berk has "continued a pattern of harassment and has created a hostile work environment, including threats to terminate plaintiff as a tenured professor."[12]

The complaint attaches voluminous exhibits, including correspondence between Dr. Berk and Dr. Tavoloni. These documents reveal at least part of Mount Sinai's side of the story: that Dr. Tavoloni insisted on changing his area of research focus to one in which he had little experience, that he consequently lost grant support for his efforts, that he has been entirely uncooperative in working with Mount Sinai to deal with a radically changed environment in which funds for medical research had become more scarce, and that he has withdrawn from medical school affairs and become exceptionally contentious and hostile. While it is at least arguable that the attachment of these materials to the complaint permits the Court to consider them for all purposes on this motion.[13] it is unnecessary to do so in order to resolve the case. Accordingly, the Court has disregarded them except insofar as they support plaintiff.

*Plaintiff's Legal Theories*

The complaint contains six causes of action. The first maintains that the salary cut and harassment constituted a constructive discharge of plaintiff without due process of law and violated the First, Fifth and Fourteenth Amendments.[14] The salary cut is alleged also to have violated the Equal Protection Clause on the theory that others similarly situated were not so treated.[15]

---

3. Although the complaint does not so state, it appears to be undisputed that the plaintiff holds a Ph.D. and is not a medical doctor.

4. Cpt¶¶ 10–13; Def. Mem. 3.

5. Cpt¶ 18.

6. *Id.* ¶¶ 18–22.

7. *Id.* ¶ 23.

8. *Id.* ¶¶ 23–24.

9. *Id.* ¶ 28 & Ex. M, at 4.

10. *Id.* ¶ 28.

11. *Id.* ¶ 30.

12. *Id.* ¶ 31.

13. *See, e.g., Kramer v. Time Warner In.,* 937 F.2d 767, 773 (2d Cir.1991).

14. *Id.* ¶¶ 34, 36.

15. *Id.* ¶ 38.

The second cause of action contends that the defendants violated plaintiff's First Amendment rights because the defendants' adverse actions were taken to retaliate against plaintiff for complaining to "the medical school's top administrators of the problems he was encountering" and, apparently, for writing to the NIH about what the complaint terms "defendants' actions in falsifying grant application documents." [16]

The third cause of action asserts that the defendants—Mount Sinai, the Mount Sinai Medical Center, and Dr. Berk—have conspired to deprive plaintiff of his constitutional rights in violation of 42 U.S.C. § 1985(3), one of the Reconstruction Era civil rights statutes.

The fourth and fifth causes of action allege breach of plaintiffs employment contract and breach of his rights as an alleged third-party beneficiary of a 1989 NIH grant, respectively. Finally, the sixth cause of action contends that plaintiff's salary cut and other actions were designed to interfere with his rights under the Mount Sinai Sheltered Annuity Plan by reducing Mount Sinai's contributions to the plan in consequence of plaintiff's reduced salary.[17] This is said to have violated ERISA.

*State Action*

The facts pertinent to the state action issue are set forth in the Barish affidavit and the exhibits thereto and are undisputed.

Mount Sinai is an academic, not for profit corporation chartered by the Board of Regents of the State of New York.[18] It is governed by a board of trustees.[19] Plaintiff's

misconception that it is part of the City University of New York ("CUNY") no doubt arises from a 1967 affiliation agreement between Mount Sinai and the Board of Higher Education in the City of New York (the "Board") pursuant to which Mount Sinai agreed to change its full name to Mount Sinai School of Medicine of The City University of New York.[20] And it is the terms of that agreement that are critical to the resolution of this issue.

*The CUNY Affiliation Agreement*

The stated purpose of the affiliation agreement was to extend CUNY's offerings in the health sciences and to afford a number of benefits to Mount Sinai.[21] Its key provisions are as follows:

1. Mount Sinai agreed to maintain and operate a medical school sufficient to secure appropriate accreditation. The Board in turn agreed that CUNY, "subject to financial ability and space limitations," would provide academic programs leading to M.S. and Ph.D. degrees in physics, chemistry and certain other fields to students completing the appropriate programs at CUNY and at Mount Sinai.[22]

2. The parties agreed to establish, "insofar as practicable," a common academic calendar and combined academic programs.[23]

3. Each party agreed, "[s]ubject to financial ability and space limitations," to admit qualified students from the other institution to its courses and to allocate fees in respect of such cross-registration.[24]

---

16. *Id.* ¶ 45. The controversy concerning the grant application seems to be whether, in light of an apparent NIH policy that grant monies may not be used to replace employer funds in the payment of the base salary of an investigator, Mount Sinai nevertheless may consider an investigator's success in obtaining grants in determining his or her full salary. *See* cpt Exs. L, O. This dispute is immaterial to the disposition of the pending motion and need not be addressed further.

17. Cpt ¶¶ 70–75.

18. Barish Aft. ¶ 3. There is no suggestion that the Medical Center, as distinct from the Medical School, is a state actor for purposes of the civil

rights claims. It appears to have been named solely because (i) it is an administrator of the Mount Sinai Tax Sheltered Annuity Plan (see cpt ¶¶ 6–7), which is relevant to the ERISA claim, and (ii) as an alleged co-conspirator oil the Section 1985(3) claim.

19. Barish Aff. ¶ 6.

20. *Id.* Ex. A, ¶ 15.

21. *Id.* Ex. A, at 1.

22. *Id.* ¶ 1.

23. *Id.* ¶ 2.

24. *Id.* ¶ 3.

4. Mount Sinai faculty members were made eligible for designation as members of CUNY's doctoral faculty for such purposes as sponsoring dissertations. Members of the CUNY doctoral faculty who also were on the Mount Sinai faculty were given the right to elect representatives to the CUNY graduate faculty council, and Mount Sinai is to "be considered to be a college of the [City] University for that purpose." With minor exceptions not here relevant, however, no Mount Sinai faculty members or employees are to be considered employees of CUNY or any of its constituent colleges for any purpose.[25]

5. Paragraph 5 provides as follows:

"The [City] University shall have the responsibility and authority to approve all courses and curriculums [sic], and appointments, reappointments, promotions, the designation of persons as department chairmen, and the granting of tenure to all members of the faculty of Mount Sinai except those designated as 'clinical.' It is the intent of this paragraph to give the University the responsibility and authority to approve the status of all faculty except for those in the non-basic science areas who are serving on a part-time basis. Such approval shall be given by a Review Committee consisting of the Chancellor of the City University, the Dean of Graduate Studies of the City University, and the Dean of Mount Sinai. The determination of said committee, by a majority vote, shall be final and shall be reported to the Board by the Chancellor in the Chancellor's Report."

6. "Regulations of Mount Sinai affecting faculty personnel and organization policies shall become effective only upon the approval of the Review Committee."[26]

7. The Board agreed to employ up to ten full-time professors in the basic sciences as requested and to be assigned by Mount Sinai.[27]

8. The parties agreed that Mount Sinai would not be deemed "part of the common school system" or be under the control or supervision of the Board, that the Mount Sinai board would retain full responsibility and authority for Mount Sinai's operations except as otherwise specifically provided in the affiliation agreement, that Mount Sinai and the CUNY and Board each would retain complete financial autonomy, and that Mount Sinai would retain complete authority over admission standards and the number of students to be admitted.[28]

9. Mount Sinai agreed to add the chair of the Board and the Chancellor of CUNY to its board of trustee.[29] The Board agreed that the dean of Mount Sinai would become a member of the City University administrative council and would have the status in CUNY academic administration equivalent to that of a president of one of the senior colleges.

*Practice Under the Affiliation Agreement*

At this point, Mount Sinai has 3,154 faculty members. CUNY provides full funding for one of them and partial funding for four others. Dr. Tavoloni is not among these.[30] Although CUNY has the right to approve, but not dictate, Mount Sinai's decisions with respect to curriculum, faculty appointments outside the basic sciences area, and organization policies, it does not in fact participate in any decision making regarding Mount Sinai's operations, academic affiliations, clinical practice or faculty appointments.[31]

*Discussion*

*The Constitutional Claims*

*State Action*

■ Plaintiff agrees that his claims under the First, Fifth and Fourteenth Amendments and 42 U.S.C. § 1983 are insufficient unless the actions complained of were "undertaken by state actors or under color of state law ..."[32] His theory of state action is that

---

25. *Id.* ¶ 4.

26. *Id.* ¶ 6.

27. *Id.* ¶ 7.

28. *Id.* ¶¶ 8–11.

29. *Id.* ¶¶ 15–16.

30. Barish Aff. ¶ 8.

31. *Id.* ¶¶ 9–10.

32. Pl. Mem. 6. Plaintiff appears to acknowledge that the third cause of action, which is based on

Mount Sinai is part of CUNY, which is an arm of the estate.[33] The theory, however, is at odds with the undisputed facts because Mount Sinai is not part of CUNY, its official name notwithstanding. The only connection between them is that spelled out in the affiliation agreement and the practice thereunder. The question therefore is whether plaintiff, on the facts now before the Court, has raised a genuine issue of material fact that warrants a trial on the issue of state action.

Plaintiff is right of course in suggesting that issues of state action do not readily yield to an easily stated, universal rule and in invoking Mr. Justice Clark's opinion in *Burton v. Wilmington Parking Authority*[34] for the proposition that it is "only by sifting facts and weighing circumstances [that] the nonobvious involvement of the State in private conduct [can] be attributed its true significance."[35] But the fact that factual variations make a categorical rule difficult is a far cry from plaintiff's suggestion that a trial is required where, as here, the facts are undisputed and the reasonable inferences therefrom would not permit a judgment in plaintiff's favor.

In contending that the Mount Sinai conduct at issue in this case was state action, plaintiff points to several features of the affiliation agreement: (1) CUNY's agreement to provide space, personnel and facilities for Mount Sinai; (2) the effort to establish a common academic calendar and, at least to some extent, combined academic programs; (3) the Board's agreement that Mount Sinai faculty members would be eligible for designation as members of the CUNY doctoral faculty for such purposes as sponsoring dissertations; (4) CUNY's right to approve courses, curricula, appointments, reappointments, promotions, designation of department chairs, and the granting of tenure to Mount Sinai faculty members; (5) the Board's undertaking to hire up to ten full time professors for assignment to Mount Sinai; (6) Mount Sinai's agreement to add the chair of the Board and the Chancellor of CUNY to its board of trustees; and (7) the name change.[36] But these circumstances, whether viewed individually or collectively, do not yield the conclusion that Mount Sinai's actions with respect to Dr. Tavoloni "may be fairly treated as [those] of the State itself."[37]

Plaintiffs reliance on CUNY's alleged provision of space, personnel and facilities[38] amounts to a contention that state funding suffices to establish state action. Likewise, his reliance on the contractual right of the Board and/or CUNY to approve courses, faculty appointments, and grants of tenure in substance argues that extensive state regula-

---

42 U.S.C. § 1985(3), also requires proof of state action, although he is ambivalent on the point. Letter, Michael A. Hardy, Esq. to the Court, Nov. 5, 1997, at 1–2 & n. 2. In light of *United Bro. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 830–33, 103 S.Ct. 3352, 3357–59, 77 L.Ed.2d 1049 (1983), the acknowledgment appears to be correct. *See, e.g., Jones v. Deutsch*, 715 F.Supp. 1237, 1248 (S.D.N.Y.1989). As there are independent grounds for dismissing the Section 1985(3) claim, there is no need to reach this point.

**33.** *See* N.Y. EDUC L. §§ 6201–03 (McKinney 1997).

**34.** 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

**35.** Pl. Mem. 6 (quoting *Burton*, 365 U.S. at 722, 81 S.Ct. at 860).

**36.** Pl. Mem. 7. Plaintiff asserts also that the affiliation agreement is permanent and that it re-

quires Mount Sinai's admissions standards to be consistent with CUNY's general admissions policies. *Id.* In these respects, he misstates its terms. While the parties expressed an intention to make the affiliation permanent, the agreement in fact is terminable on notice without cause. Barish Aff., Ex. A, ¶ 20. Further, Mount Sinai retained complete control over admissions standards subject only to the requirement that its policies "shall be consistent with the general admissions policies of the University *in regard to non-discrimination on the basis of race, creed, sex, or religion.*" *Id.* ¶ 11 (emphasis added). Plaintiffs memorandum omitted the italicized words, seemingly in an effort to portray CUNY as having control of Mount Sinai's admissions standards.

**37.** *Burton,* 365 U.S. at 725, 81 S.Ct. at 861–62.

**38.** It appears from the Barish affidavit that the extent of such support approaches the *de minimis* level. The Court does not, however, rely on the level of support in deciding the case.

tion renders its subject a state actor.[39] The law, however, is very much to the contrary where, as here, there is no connection between the action complained of and the state support or regulation.

In *Rendell–Baker v. Kohn,*[40] for example, the Supreme Court held that the discharge of a number of teachers and a counselor by a private school could not be laid at the doorstep of the state despite the fact that the state provided 90 to 99 percent of the school's budget. It framed the issue as "not whether petitioners were discharged because of their speech or without adequate procedural protections, but whether the school's action in discharging them can fairly be seen as state action."[41] It went on to note that none of the state agencies that funded or dealt with the school had any role in the discharges[42] and held that neither state funding nor state regulation of the school sufficed.

Similarly, the Court in *Blum v. Yaretsky*[43] dealt with the question whether nursing homes were state actors with respect to their decisions to transfer patients. The nursing homes in question were extensively regulated by state law.[44] State regulations required the nursing homes "to make all efforts possible to transfer patients to the appropriate level of care or home as indicated by the patient's medical condition or needs"[45] and imposed penalties on nursing homes that failed to do so.[46] Nevertheless, the Court held that the state was not sufficiently implicated in the nursing homes' transfer decisions to justify a finding of state action. It

noted that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action to that of the State for purposes of the Fourteenth Amendment."[47] It rejected the notion that "[m]ere approval or acquiescence [by the state] in the initiatives of a private party" would suffice.[48] Rather, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must be deemed to be that of the State."[49]

The Second Circuit's recent decision in *Leeds v. Meltz*[50] confirms that CUNY's support and regulation, whether actual or potential, of Mount Sinai is insufficient in these circumstances to justify a conclusion that Mount Sinai was a state actor with respect to Dr. Tavoloni. In rejecting a contention that the refusal by a CUNY Law School journal to accept an advertisement was state action and therefore subject to First and Fourteenth Amendment scrutiny, the Circuit held, in reliance on *Rendell–Baker* and *Blum,* that "[e]xtensive regulation and public funding, either alone or taken together, will not transform a private actor into a state actor; instead, the state must have exerted its coercive power over, or provided significant encouragement to, the defendant before the latter will be deemed a state actor."[51]

The fact that Mount Sinai agreed to change its name to The Mount Sinai School of Medicine of The City University of New York adds little to plaintiff's case. As the in

---

**39.** It is important to recognize that the agreement did not give CUNY or the Board any authority with respect to the compensation of Dr. Tavoloni and other Mount Sinai faculty except the handful directly employed by CUNY. To the contrary, paragraph 9 of the affiliation agreement left this matter solely to Mount Sinai.

**40.** 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

**41.** *Id.* at 838, 102 S.Ct. at 2769–70.

**42.** *Id.* at 838 n. 6, 841, 102 S.Ct. at 2770 n. 6, 2771.

**43.** 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

**44.** *Id.* at 1004, 102 S.Ct. at 2785–86.

**45.** *Id.* at 1007–08, 102 S.Ct. at 2787–88.

**46.** *Id.* at 1009–10, 102 S.Ct. at 2788–89.

**47.** *Id. at* 1004, 102 S.Ct. at 2785–86 (*quoting Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477(1974)).

**48.** *Id.*

**49.** *Id.*

**50.** 85 F.3d 51 (2d Cir.1996).

**51.** *Id.* at 54.

banc Seventh Circuit held in a similar case involving the Illinois Institute of Technology:

"The use of the State's name gives rise to an appearance of State involvement in I.T.T.'s activities, but ... unless the appearance of state support either facilitates the activity in question, or provides evidence that the institution is, in fact, a State instrumentality, it is of no relevance." [52]

There is, to be sure, a distinction between the names at issue in *Cohen* and this case. The use of "Illinois" in the name of the Illinois Institute of Technology does not unambiguously indicate a connection between the State of Illinois and the Institute, as "Illinois Institute of Technology" is susceptible also of the construction that the entity is located in rather than an arm of the State of Illinois. The name here, on the other hand, unambiguously states that Mount Sinai is a school of medicine "of The City University of New York." In the last analysis, however, this is a distinction without a difference given the lack of any contention that the state played any role in the actions complained of.

The remaining facts upon which plaintiff relies—the common features of the academic programs, the addition of Board and CUNY representatives to Mount Sinai's board, and the eligibility of Mount Sinai faculty for designation as members of the CUNY doctoral faculty—are of considerably less significance and for essentially the same reason. None even suggests that the state "coerce[d] or significantly encourage[d]" [53] the conduct at issue.

Plaintiff relies also upon *Wahba v. New York University* [54] although it is difficult to understand what he draws from it. The plaintiff in that case, a research scientist, claimed that he had been removed from an NIH-funded research project at and fired by NYU in retaliation for his having engaged in First Amendment protected activities. In affirming Judge Knapp's grant of summary judgment dismissing the action, the Second Circuit first held in essence that NYU was not a state actor because the state had nothing to do with its actions with respect to the plaintiff.[55] It then held that the NIH grant did not sufficiently involve the United States in NYU's actions to render it subject to the Fifth Amendment, in part because "[t]his kind of arrangement, whereby federal funds are used to prime the pump of research effort in private scientific institutions which the Government could not perform as well, has social values too obvious to require elaboration." [56] While Dr. Travoloni would make much of the fact that the plaintiff in *Wahba*, unlike himself, was not the principal investigator named in the NIH grant,[57] that distinction simply does not bear on the question whether the state was sufficiently involved in Mount Sinai's actions with respect to Dr. Tavoloni to render Mount Sinai an arm of the state in constitutional and statutory contemplation.

The conclusion that plaintiff has not raised a genuine issue of material fact with respect to the state action element of the first two causes of action is confirmed by the long line of Second Circuit cases dealing with similar questions in analogous institutional contexts. In *Albert v. Carovano,* [58] for example, the Court held that Hamilton College's decision to discipline students was not transformed into state action because the regulation pursuant to which it had done so was adopted to comply with state legislation mandating that colleges have disciplinary rules. It relied on Judge Friendly's opinion in the seminal case of *Powe v. Miles* [59] for the proposition—

**52.** *Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 824–25 (7th Cir.1975) (in banc), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976).

**53.** *Lebron v. Nat. R.R. Passenger Corp. (Amtrak),* 12 F.3d 388, 390 (2d Cir.1993) (citing *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)), *rev'd on other grounds,* 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995).

**54.** 492 F.2d 96 (2d Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974).

**55.** *Id.* at 98–99 (*semble* ).

**56.** *Id.* at 99–102.

**57.** Pl. Mem. 9.

**58.** 851 F.2d 561 (2d Cir.1988) (in banc).

**59.** 407 F.2d 73 (2d Cir.1968).

central in this case as well—that state action exists in circumstances like these only if the state is "involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury." [60]

Accordingly, plaintiff has failed to raise a genuine issue of fact material to the issue whether the state action requirement is satisfied.

### Rule 56(f)

■ One point remains for consideration. In response to the Court's notice that it would convert the state action branch of defendants' motion into one for summary judgment and its invitation to submit any additional evidentiary material, plaintiff sent a letter requesting a continuance to permit discovery pursuant to Rule 56(f).

FED. R. CIV. P. 56(f) provides as follows:

"Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

But the mere invocation of Rule 56(f) will not ward off a motion for summary judgment by an adverse party. Rather, the party resisting a motion for summary judgment must make a substantial showing by affidavit which:

"must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." [61]

---

**60.** 851 F.2d at 569 (quoting *Powe,* 407 F.2d at 82). *Accord, Weise v. Syracuse Univ.,* 522 F.2d 397, 405 (2d Cir.1975): *see Grafton v. Brooklyn Law School,* 478 F.2d 1137 (2d Cir.1973).

*Weise* adopted a balancing approach to the determination whether a private university is a state actor, an approach in which the required degree of state involvement diminishes as the importance of the right asserted increases. It said that five factors were to be considered— the degree to which the "private" organization is dependent on governmental aid, the extent and intrusiveness of governmental regulation, whether the governmental regulatory scheme connotes approval of the activity at issue, the extent to which the organization serves a public function or acts as a surrogate for the state, and whether the organization has legitimate claims to recognition as a "private" entity in associational or constitutional terms. 522 F.2d at 407. It went on to suggest that state action would be found more readily in cases of racial and perhaps gender discrimination than in First Amendment cases. 522 F.2d at 405–08.

It is not clear whether the *Weise* balancing test survives Supreme Court decisions such as *Blum* and *Rendell–Baker* and the Circuit's own in banc decision in *Albert.* Indeed, plaintiff does not rely on or even cite it. But *Weise* would lead to no different result. To begin with, the rights asserted in this case—freedom of speech, procedural due process and equal protection—are, or are comparable to, the rights which *Weise* placed at the end of the spectrum at which a finding of state action would be harder to come by than in a case of racial discrimination. Moreover, the *Weise*

factors do not support plaintiff. The level of state aid received by Mount Sinai, as far as this record discloses, is small—salary support for five of 3,451 faculty members. The governmental regulatory scheme upon which plaintiff relies, the affiliation agreement, is neither extensive nor intrusive, particularly ill practice. That scheme certainly does not connote approval of Mount Sinai's actions with respect to plaintiff, and Mount Sinai has legitimate claims to recognition as a private entity. While the fact that the affiliation agreement assists CUNY, a public university, in extending its offerings in the sciences and broadening the pool from which doctoral thesis advisers may be drawn would lend some credence that Mount Sinai, to a limited extent. is performing a public function or acting as a surrogate for the state, this is insufficient to outweigh the other factors favoring Mount Sinai. *See Gilinsky v. Columbia University,* 488 F.Supp. 1309, 1311 (S.D.N.Y.), *aff'd without opinion,* 652 F.2d 53 (2d Cir.1981) (finding no state action under *Weise* analysis, court rejected claim that Columbia violated Fifth and Fourteenth Amendments by twice refusing to appoint plaintiff, a woman, to professorships: insignificant that Columbia received state and federal funding, since such funding, without a showing of government involvement in the activity causing the injury, would not support state action finding.) *Id.* at 1312 (quoting *Powe,* 407 F.2d at 82).

**61.** *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994); *accord, e.g., Hudson River Sloop Clearwater, Inc. v. Dept. of the Navy,* 891 F.2d 414, 422 (2d Cir.1989); *Burlington Coat*

No such showing has been made here. Plaintiff did not comply with the affidavit requirement. His letter did not indicate what discovery plaintiff sought, why the discovery was thought likely to lead to admissible evidence sufficient to raise a genuine issue of fact on the state action issue, what efforts plaintiff had made to obtain that evidence,[62] or why those efforts were unsuccessful.

In consequence, there is no proper basis for a continuance. Defendants are entitled to summary judgment dismissing the first and second causes of action on the ground that plaintiff has failed to satisfy the state action requirement.

*The Civil Rights Conspiracy Claim*

██ The third cause of action alleges that Mount Sinai, Mount Sinai Medical Center and Dr. Berk conspired to deprive plaintiff of his civil rights in violation of 42 U.S.C. § 1985(3). That statute provides, in relevant part, that:

"If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . .; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

There are at least two fundamental deficiencies in plaintiffs attempt to state a claim under Section 1985(3). To begin with, in order to state a legally sufficient claim under that statute, the plaintiff must allege a "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the [alleged] conspirators' action."[63] This complaint is devoid of any such allegation.

Second, and equally fundamental, this complaint fails to allege the plurality of actors essential to any claim of conspiracy. The allegation that Mount Sinai conspired with Dr. Berk and the Mount Sinai Medical Center is insufficient in light of the intraenterprise conspiracy doctrine.

The intraenterprise conspiracy doctrine is drawn from Section 1 of the Sherman Act.[64] In substance, it holds that the defining element of a conspiracy—a plurality of actors committed to a common goal—is not satisfied by joint action of wholly owned subsidiaries of a single entity, unincorporated divisions of a company, or employees of a single entity acting within the scope of their employment.[65]

---

*Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985); *Pesca v. Board of Trustees*, 176 F.R.D. 110 (S.D.N.Y.1997); *Maida v. Life Ins. Co. of North Am.*, 949 F.Supp. 1087, 1092 (S.D.N.Y.1997); *Frankel v. ICD Holdings S.A.*, 930 F.Supp. 54, 66 (S.D.N.Y.1996); *Liebowitz v. Elsevier Science Ltd.*, 927 F.Supp. 688, 713 (S.D.N.Y.1996); *Thomas v. Stone Container Corp.*, 922 F.Supp. 950, 958 (S.D.N.Y.1996).

**62.** Plaintiff had ample means at his disposal to have investigated the nature of the connection between Mount Sinai and CUNY even before he filed this action. CUNY is a public institution concerning which there is a great deal of public information. Plaintiff could have requested any information lie required and, indeed, proceeded

under the state freedom of information law, N.Y. PUB. OFF. L. § 89 (McKinney 1988).

**63.** *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir.1994) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)); *accord, Estes El v. Long Island Jewish Medical Center*, No. 95 Civ. 1047(LAK), 1995 WL 217545 (S.D.N.Y. Apr.12, 1995).

**64.** 15 U.S.C. § 1.

**65.** *E.g., Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); VII PHILLIP E. AREEDA, ANTITRUST LAW ¶¶ 1462–74 (1986).

This Court only recently has considered the question whether the intraenterprise conspiracy doctrine extends to Section 1985(3) cases,[66] and no useful purpose would be served by repeating that discussion here. Suffice it to say for present purposes that the doctrine applies in this Circuit, at least with respect to an action taken by a single policy making body of a corporate enterprise, none of the members of which is alleged to have been "motivated by any independent personal stake in achieving the corporation's objective."[67] Moreover, the Circuit has held also that the doctrine renders a law school faculty and trustees incapable of conspiring, in violation of Section 1985(3), to discharge a professor.[68]

Plaintiffs conspiracy claim cannot stand in light of these principles. The alleged conspiracy is among Mount Sinai Medical Center, its subsidiary Mount Sinai, and Dr. Berk, who is the chief of the division of liver disease of Mount Sinai's department of medicine. Mount Sinai and the medical center manifestly are incapable of conspiring with one and other. Nor is there any suggestion in the complaint that Dr. Berk had the sort of independent personal interest in subjecting Dr. Tavoloni to the actions complained of that would be essential to a conclusion that he should be treated as legally distinct from Mount Sinai for these purposes.

Accordingly, the third cause of action must be dismissed.

*The ERISA Claim*

■ Plaintiff's ERISA claim, the sixth cause of action, alleges that the defendants reduced his salary and harassed him "with the specific intent of interfering with plaintiff's rights to his retirement benefits ..."[69] It alleges that defendants were motivated by a desire to force the termination of his participation in the Mount Sinai Tax Sheltered Annuity Plan ("MSTSP") and that the reduction in his salary was intended to reduce the Medical Center's contributions to the plan and resulted in the reduction of the benefits that plaintiff otherwise would enjoy. As this is a motion to dismiss the complaint, the Court assumes the truth of the factual allegations of the complaint.

Section 510 of ERISA[70] provides in relevant part:

"It shall be unlawful for any person to discharge. fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ..."

As the Supreme Court has observed, it was intended to "protect[ ] plan participants from termination motivated by an employer's desire to prevent a pension from vesting."[71] The defendants seize upon this language to argue that Section 510 cannot apply to plaintiff because his rights in the MSTSP have vested and, in any case, that the statute "does not give a participant a cause of action where an employer's conduct merely reduces the amount received pursuant to pension rights that have already vested."[72] But defendants' argument does not withstand analysis.

To begin with, while Section 510 certainly covers a termination the object of which is to prevent an employee's pension rights from vesting, it is not so limited by its terms. The statute prohibits discipline and discrimination in addition to discharge. The legislative history, moreover, supports the view that Congress intended to protect employees from

---

**66.** *Johnson v. Nyack Hospital*, 954 F.Supp. 717, 722–24 (S.D.N.Y.1997).

**67.** *Id.* at 723 (quoting *Girard v. 94th Street and Fifth Avenue Corp.*, 530 F.2d 66, 71–72 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976)).

**68.** *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978).

**69.** Cpt ¶ 73.

**70.** 29 U.S.C. § 1140.

**71.** *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 143, 111 S.Ct. 478, 485, 112 L.Ed.2d 474 (1990); *accord, Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988).

**72.** Pl. Mem. 15.

adverse employment action motivated by a desire to interfere with the attainment of rights under qualified employee benefit plans. The Senate Report, for example, indicates that Section 510 and other provisions were enacted "in the face of evidence that in some plans a worker's pension rights or the expectations of those rights were interfered with by the use of economic sanctions or violent reprisals."[73] Surely substantial salary cuts and other harassment, if intended to force an employee to quit for the purpose of preventing the employee from vesting, would run afoul of the statute.[74] And the fact that plaintiffs rights already have vested does not defeat plaintiffs claim, at least at the pleading stage, in the face of the allegation that defendants were motivated by a desire to reduce their contributions to the MSTSP, with the effect that the benefits to which plaintiff otherwise would have been entitled at retirement would be reduced—in other words, that defendants cut plaintiff's salary for the purpose of reducing the benefit level that he otherwise would attain.

Defendants surely are correct in saying that employer conduct that "merely reduces the amount received pursuant to pension rights that have already vested" does not give rise to a Section 510 claim.[75] But that argument does not carry the day either.

This complaint does not assert that defendants "merely" have taken action that will reduce the amount that plaintiff ultimately will receive. It asserts that the action was taken for the specific purpose of disciplining plaintiff, in a discriminatory manner, in order to force his termination as a tenured faculty member and thus his participation in the MSTSP.[76]

It remains to be seen whether plaintiff can prove these allegations.[77] On this motion to dismiss, however, he is entitled to the assumption that they are true. In consequence, the motion to dismiss, insofar as it is addressed to the sixth cause of action, must be denied.

*The Contract Claim*

■ The fourth cause of action alleges that the defendants have breached the employment contract with plaintiff in that they (1) "effectively discharge[d] him from his tenured position," (2) cut his salary to a level which is not the "minimum rate for rank" paid by Mount Sinai, and (3) violated his right to academic freedom by reducing his compensation and conditioning any increase on his obtaining a new research grant notwithstanding plaintiff's claim that "salary may not be increased as a result of receiving a research grant."[78] Defendants seek dis-

73. S. Rep. No. 93–127, 93d Cong., 1st Sess. 18 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4872.

74. *See West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980) (quoting remarks of Senator Hartke) ("Discipline and discrimination can be so unpleasant as to amount to constructive discharge ... That can be the type of harassment which does not say that one is fired, but makes living such a hell that a person wishes he did not have to hang on and endure.")

75. *E.g., Dister*, 859 F.2d at 1111.

76. Cpt. ¶ 74.

77. Certainly they seem improbable. If the MSTSP is anything like most such plans, the amount of the employer contribution is a small fraction of the employee's overall compensation. Given the fact that plaintiff admittedly is vested in the MSTSP, the only effect of a pay cut on his participation would appear to be an incidental reduction in the employer contribution—a savings to the employer that would be dwarfed by the savings from the reduction in salary. As

liability under Section 510 requires proof of a specific intent to interfere with pension rights, *e.g., Dister*, 859 F.2d at 1111, and as "[p]roof of an incidental loss of benefits ... will not constitute a violation," *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3d Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987), the plaintiff has a very difficult row to hoe here.

78. Cpt ¶¶ 55–58.

The allegation that grant funds may not be used to pay salary appears to be a blatantly misleading distortion of the NIH's policy that grant funds may not be used to replace part of the "base salary" of an investigator that otherwise would be paid by the employing institution. Cpt Ex. L. There appears to be no prohibition of grant funds being used to support all or part of an investigator's salary in excess of the base. Indeed, in his application for the 1989 NIH grant, plaintiff sought five year support for 80 percent of his salary and noted that 40 to 60 percent of his salary for the preceding three years had been provided by an earlier grant. *Id.* Ex. D, at 5.

missal of this claim on the basis that Mount Sinai in fact is paying the current minimum rate for rank.

Both parties proceed on the assumption that the terms of the contract at issue are those set forth in the Mount Sinai *Faculty Handbook*, portions of which are attached to the complaint and therefore appropriately considered on this motion. It is readily apparent that neither the Mount Sinai Medical Center nor Dr. Berk is a party to that contract. The fourth cause of action therefore must be dismissed as to them, thus leaving the question whether plaintiff has stated a cause of action in contract against Mount Sinai.

Plaintiff's contract allegations appear to be exceedingly thin.[79] Nevertheless, the Court is bound to deny a motion to dismiss if plaintiff could prove any facts under the allegations of the complaint that would entitle the plaintiff to relief. Mount Sinai has not addressed the issues raised by this claim apart from its contention that it is paying the plaintiff the minimum rate for rank.[80] In this posture, the Court cannot exclude the possibility that plaintiff might be able to make out a contract claim. Accordingly, insofar as the motion seeks dismissal of the fourth cause of action as against Mount Sinai, it is denied.

*The Third Party Beneficiary Claim*

■ The fifth cause of action contends that Dr. Tavoloni is entitled to recover as a third party beneficiary of a five year 1989

NIH grant because Mount Sinai breached its obligation to the NIH by failing to provide plaintiff with the laboratory facilities that it promised NIH it would provide and that Mount Sinai intentional interfered with plaintiff's 1996 grant application in a manner unspecified.[81] Defendants seek its dismissal on the ground that the relationship between Mount Sinai and the NIH created by the NIH grant is statutory rather than contractual and, in consequence, that plaintiff enjoyed no third party beneficiary rights.

To be sure, a number of courts have held that the relationship created by grants under other government grant programs is not contractual in nature.[82] Moreover, some federal statutes distinguish between parties to government contracts and those who receive other forms of federal "financial assistance."[83] But the pertinent statute permits the directors of the various national institutes to enter into contracts and to make grants and cooperative agreements for research.[84] While the complaint in this case speaks in terms of a "grant," it does not altogether exclude the possibility that the relationship between Mount Sinai and NIH was contractual, particularly as the document making the grant does not appear of record. Accordingly, the third party beneficiary claim cannot be dismissed at this stage as to Mount Sinai.[85]

■ The same is not true of the conclusory allegation that the defendants interfered with plaintiff's subsequent grant application. In order to state a claim for interference

---

**79.** For example, the assertion that plaintiff has been constructively discharged notwithstanding the fact that he still is employed by Mount Sinai appears to be utterly without merit. *See, e.g., Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983) (quoting *Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir.1975) (constructive discharge occurs when an employer "deliberately makes an employee's working conditions so intolerable *that the employee is forced into all involuntary resignation*") (emphasis added)); *Boyd v. Schembri*, No. 94 Civ. 7119(JSM), 1997 WL 466539, at *3 (S.D.N.Y. Aug.13, 1997).

**80.** Mount Sinai's affidavit states that plaintiff, contrary to his allegation, is being paid exactly the minimum rate for rank. As the Court did not give notice that it would consider the affidavit with respect to the contract claim, however, it

has not converted the motion to dismiss that claim into a motion for summary judgment.

**81.** Cpt ¶¶ 63–66.

**82.** *See, e.g., United States v. Vanhorn*, 20 F.3d 104, 110 (4th Cir.1994). *United States v. Becker*, 995 F.2d 779, 783 (7th Cir.1993).

**83.** *Compare* 29 U.S.C. § 793 *with id.* § 794.

**84.** 42 U.S.C. § 284(b)(2).

**85.** As in the case of the fourth cause of action, there is no suggestion in the complaint that either the Mount Sinai Medical Center or Dr. Berk was a party to the grant. In consequence, there is no legally sufficient third party beneficiary claim against either of them.

with prospective economic advantage, a plaintiff must allege the existence of business relations with a third party, that defendants interfered with those relations "with the sole purpose of harming the plaintiff or [by] dishonest, unfair, or improper means," and injury to the relationship.[86] Plaintiff has not here alleged the requisite disinterested malevolence or the use of improper means. Accordingly, insofar as the fifth cause of action purports to assert a claim for interference with prospective economic advantage, it is dismissed.

### Conclusion

Defendants' motion to dismiss the complaint is granted to the extent that the Court:

1. grants summary judgment dismissing the first and second causes of action as to all defendants and

2. dismisses for failure to state a claim upon which relief may be granted:

(a) the third cause of action as to all defendants,

(b) the fourth and fifth causes of action as to the Mount Sinai Medical Center and Dr. Berk, and

(c) so much of the fifth cause of action as purports to allege a claim against Mount Sinai for tortious interference with prospective economic advantage.

The motion to dismiss is denied in all other respects.

The Court will conduct a pretrial conference at 12 noon in Courtroom 12D on November 24, 1997. The stay of discovery is continued pending the conference.

SO ORDERED.

---

86. *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994).