NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12688


LYNN HLATKY vs. STEWARD HEALTH CARE SYSTEM, LLC.


Suffolk.     September 9, 2019. - April 28, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, & Cypher, JJ.


Contract, Performance and breach, Implied covenant of good faith
      and fair dealing, Damages.  Damages, Breach of contract,
      Remittitur, Interest.  Interest.  Judgment, Interest.
      Practice, Civil, Interest.



      Civil action commenced in the Superior Court Department on
February 7, 2014.

      The case was tried before Karen F. Green, J., and motions
to amend the judgment, for judgment notwithstanding the verdict,
and for a new trial were heard by her.

      The Supreme Judicial Court granted an application for
direct appellate review.


      Kevin P. Martin (Brian T. Burgess, of the District of
Columbia, also present) for the defendant.
      Joseph L. Bierwirth (M. Patrick Moore, Jr., also present)
for the plaintiff.
      Ben Robbins & Martin J. Newhouse, for New England Law
Foundation, amicus curiae, submitted a brief.

BY THE COURT.  After a trial that was bifurcated on the issues of liability and damages, a jury in the Superior Court found that the defendant, Steward Health Care System, LLC (Steward), committed a breach of the express terms of its contract with the plaintiff, Lynn Hlatky, as well as the contract's implied covenant of good faith and fair dealing, when Steward withdrew its support for Hlatky's cancer research laboratory, causing the laboratory to close its operations.  The jury awarded Hlatky in excess of $22 million in damages for the breach.  The trial judge denied Steward's motion for a judgment notwithstanding the verdict or, in the alternative, to amend the judgment.  However, the judge conditionally ordered a new trial unless Hlatky agreed to remit all but $10.2 million of the damages awarded; this figure represented $200,000 incurred by Hlatky in out-of-pocket mitigation costs and $10 million that she testified was necessary to reestablish her laboratory. Hlatky accepted the remittitur while reserving her right to appeal.

Both sides appealed.  Steward makes three principal claims. First, it argues that the judge erred as a matter of law in allowing Hlatky to recover damages for the cost of reestablishing her laboratory, where she did not personally own any of the laboratory's equipment or have any ownership interest in the Federal grants that the laboratory received to fund its

operations.  Second, Steward argues that, even if Hlatky could be awarded damages for the cost of reestablishing a laboratory, the judge abused her discretion in awarding Hlatky $10.2 million on remittitur because, in the absence of expert testimony or other competent evidence as to the cost of reestablishing the laboratory, the evidence was insufficient as a matter of law to support any award other than the out-of-pocket mitigation costs incurred by Hlatky in the amount of $200,000.  Third, Steward claims that the judge erred in granting prejudgment interest from the date of the breach rather than the date that Hlatky filed her complaint.  In her cross appeal, Hlatky argues that the judge abused her discretion in conditionally ordering a new trial and remitting the award of damages to $10.2 million.

Six Justices participated in this appeal.[1]  The Justices unanimously agree that the trial evidence supported the finding that Steward, by withdrawing its promised support for the research laboratory, committed a breach of both the express terms of the contract and the implied covenant of good faith and fair dealing; that, in the unique circumstances of this case, the cost of reestablishing a cancer research laboratory was a permissible element of the damages, as it would restore Hlatky to the position in which she would have been had Steward

---

[1] We acknowledge the amicus brief of the New England Law Foundation.

complied with its contractual obligations; that the judge did not abuse her discretion in conditionally ordering a new trial and a remittitur of all but $10.2 million of the award of damages; and that prejudgment interest should run on the award of damages from February 7, 2014, the date Hlatky commenced this action by filing her complaint. As to these aspects of the appeal, all Justices agree with the reasoning set forth in parts 1.a, 2, 3, and 4 of Chief Justice Gants's opinion, post.

The Justices are equally divided, however, as to one aspect of the award of damages. Three Justices -- Chief Justice Gants, joined by Justices Gaziano and Lowy -- are of the view that the amount of damages attributable to the cost of reestablishing Hlatky's laboratory ($10 million) should not go to Hlatky outright, but rather should be subject to a restriction that would ensure that this portion of the award (plus the prejudgment interest attributed to it) would be devoted solely to reestablishing a functioning cancer laboratory or supporting comparable cancer research, and would not be used by Hlatky for other purposes. Post at  -  . Three other Justices -- Justice Lenk, joined by Justices Budd and Cypher -- would impose no such restriction, for the reasons set forth in Justice Lenk's concurring opinion, post at  -  . Because the court is equally divided on this point, the award of damages (after the remittitur) shall stand without any restriction.

Therefore, by a unanimous court, the judgment on liability is affirmed.  The judge's order denying Steward's motion for judgment notwithstanding the verdict or, in the alternative, to amend the judgment, and her order conditionally granting a new trial unless Hlatky remitted all but $10.2 million of the award of damages, are also affirmed by a unanimous court.  By an equally divided court, the award of damages outright to Hlatky without restriction is also affirmed.  Finally, the judge's order concerning prejudgment interest is vacated, and, in its place, an order shall enter stating that the prejudgment interest runs from the date of the commencement of this action.

<u>So ordered</u>.

GANTS, C.J. (concurring in part and dissenting in part, with whom Gaziano and Lowy, JJ., join).  As explained in the foregoing opinion, I am joined by all of my colleagues on the quorum with respect to parts 1.a, 2, 3, and 4 of the "Discussion" section below.  With respect to part 1.b, however, I write only for myself and for Justices Gaziano and Lowy.

Background.  1.  Facts.  The facts that the jury reasonably could have found from the evidence are as follows.

Lynn Hlatky is a cancer researcher who received her Ph.D. in physics and biophysics from the University of California-Berkeley (Berkeley) in 1985.  While at Berkeley, Hlatky was awarded her first research grant from the National Cancer Institute to develop what she characterized as a "model for cancer" using physics.  Her model became the standard in the field and helped her achieve professional prominence.

Thereafter, Harvard Medical School (Harvard) recruited Hlatky, and in 1989 she joined the radiation and oncology department as a faculty member.  At Harvard, Hlatky established her first research laboratory, in part using equipment she brought with her from Berkeley.  Hlatky worked at Harvard for sixteen years, conducting "wet lab" or benchtop research, with a focus on combining the fields of mathematics and cancer biology to improve cancer treatment modeling.  In 2004, Hlatky applied for and received a $10 million research grant from the National

Aeronautics and Space Administration (NASA), and served as the principal investigator for the grant.[1]

In the world of Federal grant funding for scientific research projects, grants are typically awarded based on an evaluation of the ability of the principal investigator, the quality of the science, and the institutional support for the project.  The principal investigator is the person responsible for the research, and essentially runs the laboratory, but the grant is awarded to and administered by the nonprofit organization or institution, which receives and disburses the grant funds and serves as the project administrator.  Usually, a research administrator at the nonprofit institution is responsible for helping the principal investigator apply for grants and ensures that all funds are used in accordance with applicable law and grant requirements.

When a laboratory purchases equipment for a research project, the institution incurs the expense and then seeks

---

[1] Federal grants fund both the direct and indirect costs associated with a research program.  Direct costs are project-specific costs that are approved by the granting agency and go directly to the proposed research, such as the costs of project equipment, and payroll for the research team.  Indirect costs are the costs for the institution to provide support not directly related to the science, such as facility and administrative costs.  In grant administration parlance, when one speaks about the amount of an award -- say, $10 million -- it refers to the direct cost of the research, not the additional funding an institution receives for indirect costs.

reimbursement by the Federal grantor from awarded grant funds. If a principal investigator wishes to move her research and grant funding from one institution to another, the current institution could relinquish the remainder of the grant, and the next institution would apply to take over its administration. The principal investigator might also request to take the equipment that was purchased with Federal grant funds to her new laboratory. When there is a dispute between the investigator and the institution regarding the transfer of grant funding or of laboratory equipment, the Federal grantor decides whether the funding and equipment follow the principal investigator.

In 2005, after Hlatky secured the research grant from NASA, she moved her laboratory to St. Elizabeth's Hospital, which was part of the Caritas Christi Hospital system (Caritas). Hlatky brought with her to Caritas not only the NASA grant, but also her team members, equipment, reagents, and, most importantly, cell samples generated through her research. The cell samples were stored in small vials, tens of thousands of which were placed inside large, specialized freezers containing liquid nitrogen. After moving to Caritas, Hlatky founded the Center of Cancer Systems Biology (Center) and continued to expand her laboratory by obtaining additional Federal grant funding. She used the funds to renovate her laboratory space, hire additional researchers, and purchase specialized equipment, such as

incubators, sterile hoods, and "minus 80 degree" freezers for her samples.

Steward Health Care System, LLC (Steward), a private, for-profit hospital system, acquired Caritas in November 2010. After the acquisition, Hlatky continued to manage the Center and work as the principal investigator without a contract from Steward for more than a year. During this period, other institutions, including Tufts Medical Center, encouraged Hlatky to relocate the Center to their respective institutions, but she wished to stay at Steward if possible because of the difficulty involved in moving her laboratory. At that time, Hlatky and her team had developed a unique method for transforming healthy, normal cells into cancer cells without radiation or other methods, which she described as the "Holy Grail" of research findings. Her team's findings generated additional grant funding, with the ultimate goal of eventually developing cancer vaccines.

In February 2012, Hlatky and Steward agreed to a three-year contract, retroactive to October 1, 2011, renewable by mutual agreement, for Hlatky to continue to serve as the Center's director. The contract declared that it was Steward's "vision" that under Hlatky's leadership, the Center would "evolve into an internationally competitive program." Under the contract, Hlatky would initially report to Dr. Peter Catalano, Steward's

medical director of research, while Steward formalized the Steward Research & Specialty Projects Corp. (SRSPC), a new nonprofit entity to which Hlatky eventually would report.[2] The contract provided that Hlatky would receive an annual salary of $425,000, and that Steward would supply $323,000 in annual funding "to be used for recruitment of research personnel, laboratory supplies, animal expenses, and expenses required to support [Hlatky's] research." Finally, the contract stated that Steward would "continue to provide support and suitable office space" for the Center. On July 1, 2012, Hlatky began to report to the newly-created SRSPC, but because Steward was its sole member, its creation did not materially affect the operations of the Center.

Hlatky entered into the contract believing that it would assure her a degree of security and stability for her research samples, team, and funding. Instead, in the fall of 2012, Steward decided to transition away from benchtop research -- the type of research performed by the Center. Steward had, in fact, been contemplating getting out of benchtop research prior to entering into the three-year contract with Hlatky, but did not tell her of these internal conversations. On December 31, 2012,

---

[2] Steward is a for-profit entity, but it was necessary that Hlatky report to a nonprofit entity to comply with the conditions of the Center's Federal grant funding.

Steward resigned and withdrew as the sole member of SRSPC, and the nonprofit entity was renamed GeneSys Research Institute (GeneSys). Dr. Catalano, Daniel Meyers, and David Horowitz replaced Steward as GeneSys's members, and only two months later, Catalano ended his association with GeneSys. Steward did not perform due diligence on Meyers or Horowitz, who were not previously associated with Steward, to determine whether they were qualified to lead a nonprofit entity with millions of dollars in Federal grant funding.

The transition to GeneSys proved disastrous for Hlatky's laboratory. When Steward withdrew, all of the operations of SRSPC that Steward had been providing were shut down and thus had to be rebuilt for GeneSys. Dr. Catalano in his testimony described it as essentially trying to "start up a new business," including management, payroll, benefits, maintenance, lease agreements, and information technology. But because of the rapid nature of the transition, which occurred within weeks, GeneSys was not ready to take over the administration of the Center's research laboratory. Steward, even though no longer a member of GeneSys, continued to be involved in GeneSys's administration, including maintaining control of the Center's research bank accounts, equipment, payroll, and benefits. And this lingering involvement caused further confusion and delay, as Steward employees were unclear whether Steward or GeneSys was

handling accounts payable, accounts receivable, and purchasing for the Center. Nevertheless, Steward proceeded to demand payment from GeneSys for the Center's laboratory space -- something the Center previously did not have to pay for when SRSPC was the administering institution -- and appeared to charge the Center for the use of the research equipment and administrative services.

During the transition to GeneSys, the Center did not have a designated research administrator to apply for and administer the Center's Federal grants. The confusion regarding research administration, and having to reestablish a research administration within GeneSys, eventually led to GeneSys failing to file a timely grant proposal with NASA on the Center's behalf. Another effect of spinning GeneSys off from Steward was that Hlatky could no longer cite Steward's institutional support in her grant applications even though Steward refused to turn over millions of dollars in research funding to GeneSys or the Center.

GeneSys chose not to renew Hlatky's contract, which ended September 30, 2014. GeneSys paid Hlatky her full salary, but terminated her employment as well as the employment of most of the Center's team -- approximately thirty people. GeneSys retained all of the Center's assets, including specialized equipment and research samples. Less than a year later, in July

2015, GeneSys filed a petition for bankruptcy, in large part due to millions of dollars of debt owed to Steward. In short, a reasonable jury could have found that Steward spun GeneSys off as a separate nonprofit entity and then proceeded to extract millions of dollars from GeneSys, which was largely funded by the Center's grants.

A bankruptcy judge granted the Chapter 11 trustee permission to sell the Center's research and other equipment at public auction and to dispose of biological materials, including the cell samples. Hlatky objected to the sale of the equipment and samples, arguing that the assets were held in trust by GeneSys for the benefit of government agencies, like the National Institute of Health and the United States Department of Energy, which funded the Center's valuable research.[3] The judge allowed the sale to proceed, finding that Hlatky had not "shown any rights or interests in, or to, the [e]quipment being sold, and [did not have] standing to assert the rights or interests of the United States concerning research grants." Ultimately, the equipment was auctioned off and the cell samples were destroyed.

---

[3] The Department of Energy also filed an objection to the sale of the assets, maintaining that the United States had a right to control the biological materials and equipment needed to continue department-funded research. The judge overruled the department's objections.

2.  Procedural history.  On February 7, 2014, before the Center was shut down and GeneSys filed for bankruptcy, Hlatky filed suit against Steward for breach of contract and breach of the implied covenant of good faith and fair dealing.  Hlatky alleged that Steward committed a breach of the February 2012 contract by "fail[ing] to provide a suitable facility and environment," and failing to support and oversee GeneSys in a way that would permit Hlatky to conduct her research.  Hlatky did not seek specific performance or other injunctive relief; she demanded money damages for the alleged breach.[4]

On June 5, 2017, the judge bifurcated the case for trial. During the liability phase of the trial, the jury concluded in their special verdict that Hlatky's contract was with Steward, not SRSPC; that Hlatky performed her obligations under the contract; and that Steward committed a breach of both the contract and the implied covenant of good faith and fair dealing.  Although the jury were not asked in the special verdict to identify the term in the contract that Steward had breached, we can discern from the evidence and closing arguments that the jury determined that Steward had failed to fulfill its obligation to "continue to provide support and suitable office

---

[4] Steward filed counterclaims against Hlatky, which it agreed to dismiss with prejudice before trial.

space" to Hlatky for the work of the Center. Steward does not contest on appeal the jury's findings as to liability.

Before the damages phase of the trial, Steward filed a motion in limine to limit the permissible scope of Hlatky's claim for damages. In her supplemental answers to interrogatories, Hlatky asserted that she was seeking $11,793,793 in damages from Steward to allow her to rebuild the laboratory that Steward had effectively destroyed through its breach. In determining this amount, she calculated that the total cost of recreating the laboratory was $10,187,516 based on Steward's proof of claim during the bankruptcy proceeding, and she added to this amount $1,606,277 in grant funding that she claimed was available to the Center at the time of the breach. In addition, Hlatky sought $24,444,404 in damages to compensate her for the loss of future grant funding the Center allegedly would have obtained but for Steward's breach.

Steward argued that all of these categories of damages must be excluded from trial for two independent reasons. First, it argued that the damages claims were not supported by expert testimony[5] and that, to the extent they relied on Hlatky's testimony, they were speculative and not based on personal

---

[5] The judge precluded Hlatky from introducing expert testimony as to her damages because she failed to timely disclose the identity of any damages expert prior to trial.

knowledge. Second, Steward contended that Hlatky did not "suffer[]" these damages "in her individual capacity," because she did not have an ownership interest in the grants, the research equipment, or the samples.

As to Steward's first argument, Hlatky responded that, as the principal investigator for the Federal grants and as the person who created and managed the Center, she had sufficient personal knowledge to offer admissible testimony regarding the cost of rebuilding a comparable laboratory. As to Steward's second argument, Hlatky countered that that the destruction of the laboratory was a foreseeable consequence of Steward's breach of its obligation to "continue to provide support" for the Center, and that she was entitled to the benefit of that bargain. Here, that meant the amount of money necessary to restore her to the position she would have been in if Steward had provided the support it promised in the contract, that is, for her to have a functioning laboratory supported by grant funding. Hlatky did not contend that she had any ownership interest in the grants, laboratory equipment, or cell samples, but claimed that she did have an individual interest in being able to continue her life's scientific work, which Steward destroyed through its breach.

The judge allowed Steward's motion in limine in part. As to the claim for $24.4 million in future grant funding, she

allowed the motion because she found the claim to be "highly speculative," noting that "neither the amount calculated nor the appropriateness of the methodology used to perform that calculation is supported by expert testimony." The judge also declared that, "even if [Hlatky] were to receive future grants, she would not be the actual recipient of those grant funds."

As to the damages calculation of nearly $11.8 million, the judge ruled that it rested on an inadequate foundation, noting that "fully $10.2 million of it appears to be based on a calculation prepared by [Steward] in connection with [GeneSys's] bankruptcy for a purpose other than the one for which plaintiff seeks to admit it and the plaintiff has made no showing that she has personal knowledge of its basis." The judge added that "plaintiff herself testified during her deposition that the $10.2 million is a 'speculative or fictitious number.'" Although the judge ruled that Hlatky could not testify as an expert on valuation, the judge did not prohibit Hlatky from arguing that she was entitled to damages for the cost of reestablishing a functioning laboratory if she could prove those damages by lay testimony based on personal knowledge. The judge declared that her ruling was "without prejudice to [Hlatky] offering evidence as a lay witness during the damages phase of the trial on the consequential damages she alleges she suffered as a result of the defendant's breach." When Hlatky's attorney

sought clarification of the judge's ruling, noting that "the fact of the matter is, she had a lab, and now she doesn't," the judge declared, "I don't think you're precluded from offering evidence as to damages by virtue of this ruling." The judge also did not foreclose the possibility of Hlatky recovering damages based on what a reasonable entity in Steward's position would have understood as the natural and probable consequences of withdrawing support from the Center.

At the damages phase of the trial, Hlatky testified on redirect examination that Steward's withdrawal of support caused her to lose her life's work -- twenty-five years of cancer research and the prospect of future funding -- when she was at the peak of her career. She stated that she was seeking, through money damages, to restore her laboratory to some "minimal-functioning place" that would allow her to once again compete for funding and complete her research. When asked how much she would need to accomplish that, she answered: "We need[] $10 million to even get a functional lab together, get people together, and try to redo these projects, and we want[] $24 million as future funding." Steward objected to Hlatky's answer, and the judge allowed Steward's motion to strike the reference to $24 million. But the judge denied Steward's motion to strike the reference to $10 million, finding that, as to this part of the answer, Steward's counsel had opened the door on

cross-examination by asking Hlatky whether she had priced the cost of reestablishing her laboratory.[6] Steward did not question Hlatky on recross-examination about her testimony that it would cost $10 million to build a functional laboratory. Hlatky also testified that it cost approximately $3.75 million to $4 million annually to run the Center in 2012, that she spent approximately $200,000 of her own money between 2013 and 2015, including the cost of hiring a strategic communications consultant, in a failed attempt to save the laboratory, and that she had not worked in benchtop cancer research since she left Steward in 2014. She did not, however, offer any testimony concerning lost future wages.

At the charge conference in the damages phase of the trial, the judge asked Hlatky's counsel whether he planned to suggest a

---

[6] The following exchanges occurred on cross-examination of Hlatky:

Q.: "Dr. Hlatky, you've done nothing to identify the cost of specific items for starting up a lab; is that correct?"

A.: "I would say that's incorrect. I mean, for example, we've been very active in Bankruptcy Court, and in Bankruptcy Court we identified, you know, like the confocal was [$] 500,000 -- okay? -- and it sold at auction for under [$] 10,000. Okay? But the replacement -- plus, we identified the alumina as being an 80,000-dollar piece of equipment with 40,000 dollars' worth of software and other accessories."

Q.: "And you have done nothing to price out what a build-out today would be, correct?"

A.: "That I disagree with. I've done a lot of things."

damages figure during his closing argument. Counsel stated he did not intend to advocate for a final figure, but planned to mention Hlatky's estimate that it would take $10 million to restore her laboratory. Steward did not object, either at the charge conference or in Hlatky's closing argument itself, to Hlatky's claim for damages based on the $10 million testimony.

In closing argument, Steward's counsel essentially asserted two points. First, that Steward did not cause Hlatky's damages because there were "a number of decision points and opportunities" for Hlatky, as chief executive officer (CEO) of the Center, "to save her science" and her laboratory, but she made "a series of bad business decisions" and now was blaming Steward for her own failures. Second, Steward asked the jury to not award damages to Hlatky to replace equipment she never owned and grant money she did not personally receive. Hlatky's counsel, in closing, argued that it was foreseeable the Center would be destroyed if Steward failed to honor its contractual commitment to provide support, and that the demise of the laboratory followed directly from that lack of support. He asked the jury to help "recreate a world where Steward hadn't abandoned" Hlatky so that she could continue to perform cancer research for at least six more years. And he asked the jury to credit Hlatky's testimony that "it's going to take $10 million

to put this lab back together," because "[t]he CEO knows what it costs."

In her instructions to the jury, the judge said that Hlatky had the burden of proving by a preponderance of the evidence that Steward's breach "caused her individually" some damage and that Hlatky could recover monetary damages only for harm that "she suffered" as a result of the breach. The judge explained:

> "[Hlatky] is entitled to recover damages sufficient to give her the benefit of her contractual bargain as long as such damages are reasonably proved. In other words, [Hlatky] is entitled to those damages that would put her in a position to obtain that which she bargained to obtain so far as compensation and money can be computed by rational methods upon a firm basis in fact. . . . Thus, in determining any damage amount, you should consider what, if any, damages claimed by [Hlatky] were the natural and probable results of the breach, what the parties knew or reasonably could be presumed to have known at the time they entered into the contract on January 19, 2012, and whether the damages [Hlatky] claims were foreseeable to [Steward] at that time."

Neither party objected to the judge's final instructions. The jury in their answers to special verdict questions found that Steward's breach of the contract and of the implied covenant of good faith and fair dealing caused Hlatky actual damages "individually" in the amount of $22,637,500. Judgment was entered the same day with the statutory rate of prejudgment interest running from the date of the complaint -- February 7, 2014.

The parties each filed postjudgment motions. Hlatky moved to amend the judgment to reflect statutory interest commencing from the date of the breach, which Hlatky asserted was December 31, 2012, rather than the date the complaint was filed. The judge allowed Hlatky's motion.

Steward moved for judgment notwithstanding the verdict, a new trial, or amendment of the judgment to reduce the award of damages. Steward contended that the only damages Hlatky placed before the jury were the loss of laboratory equipment and grant funds in bank accounts, all of which were institutional assets belonging to GeneSys, not her. Steward also argued that Hlatky failed to present sufficient evidence to support an award of over $22 million. In the alternative, Steward asked the judge to amend the judgment to, at most, the $200,000 in out-of-pocket expenses Hlatky incurred.

The judge rejected Steward's argument that Hlatky failed to prove any personal contract damages. The judge noted that the "long-established rule for breach of contract damages is that the plaintiff should receive the benefit of her bargain and be placed in as good a position as she would have been in if the contract had been performed." She acknowledged that Hlatky did not seek to recover for lost grant funds and did not claim a property interest in the equipment used by the Center. And she recognized that "[i]t is difficult to apply these standard

principles to the unique facts of this case." But she concluded that, "in the context of a case involving the foreseeable destruction of a longstanding scientific research program as the result of a breach of a contract and its implied covenant of good faith," Massachusetts law "permits a plaintiff to recover damages representing the benefit of her bargain to place her in as good a position as she would have been in if the contract had been performed." Applying that principle in this case, she held:

> "[T]he defendant's breach foreseeably resulted in the destruction of a researcher's life work. Although Hlatky has no ownership interest in the Center's equipment or samples, which were funded by the taxpayers, she had an expectation interest in the continuation of the research program that she created, operated for twenty-five years, and helped fund by using talents and efforts to obtain federal grants. The destruction of Hlatky's life work in cancer research resulted in damages personal to her that she may recover under Massachusetts contract law."

Having so found, the judge denied Steward's motions for judgment notwithstanding the verdict and, in the alternative, to amend the judgment to reduce the award of damages.

However, as to Steward's motion for a new trial, the judge concluded that the award of over $22 million was not supported by the evidence presented at trial. Pursuant to Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974), she conditionally ordered a new trial on damages unless Hlatky accepted a remittitur to $10.2 million -- $10 million to reestablish a laboratory and $200,000

for Hlatky's out-of-pocket expenses.  Hlatky moved for
reconsideration of the remittitur, claiming that, where there
was evidence in the record that it would cost $10 million to
reestablish a minimally functional laboratory and that the cost
per year to operate the laboratory was between $3.75 million and
$4 million, there was sufficient evidence to support an award of
damages of over $22 million.  The judge denied Hlatky's motion
for reconsideration, concluding that an award of future
operational costs would constitute a windfall to Hlatky where
she presented no evidence that she required uninterrupted
financial support of operational costs for several years in
order to restore her laboratory to a position where it could
realistically apply for Federal grants.  Hlatky accepted the
reduced award, reserving her right to cross-appeal the
remittitur decision.

Steward timely filed a notice of appeal and Hlatky cross-
appealed.  This court allowed Steward's application for direct
appellate review.

Discussion.  We confront four arguments in these cross
appeals -- three by Steward and one by Hlatky -- which we
address in turn.

1.  Measure of damages.  a.  Cost of recreating the
laboratory.  Steward argues that the judge erred as a matter of
law in allowing Hlatky to recover damages for the cost of

rebuilding a laboratory, where she did not personally own any of its equipment or have any ownership interest in the Federal grants it had received. Steward contends that the judge should have amended the amount of the judgment under Mass. R. Civ. P. 59 (e) to $200,000, compensating Hlatky only for her out-of-pocket mitigation costs.

Steward does not contend that the judge erred in instructing the jury regarding damages. Nor, reasonably, could it, where it offered no objection to the jury instructions, allowing them to become the law of the case. See Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974); Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 559, cert. denied, 516 U.S. 931 (1995) ("Neither party objected to these instructions, which, therefore, became the law of the case"). Rather, Steward claims that, even though the judge did not preclude Hlatky from offering evidence regarding the cost of rebuilding a laboratory, the judge's instructions limiting damages to those Hlatky suffered personally effectively precluded the jury from considering the cost of rebuilding in determining damages.[7]

Whether the judge applied the proper measure of damages is a question of law that is reviewed de novo. Twin Fires Inv.,

---

[7] The parties agree that Hlatky did not seek damages for or introduce evidence relating to reputational harm, emotional distress, or lost future earnings arising from Steward's breach of contract.

LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 424 (2005). "The usual rule for damages in a breach of contract case is that the injured party should be put in the position [she] would have been in had the contact been performed." Situation Mgt. Sys. v. Malouf, Inc., 430 Mass. 875, 880 (2000); see also Restatement (Second) of Contracts, § 344(a) (1981) (plaintiff in breach of contract action is entitled to damages to protect "his 'expectation interest,' which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed"). I agree with the trial judge that it is difficult to apply these principles to the unique facts of this case.

It is important to recognize that the contract that Hlatky entered into with Steward was not merely an employment contract; Steward committed not only to employ Hlatky as the director of the Center until September 30, 2014, but also to "provide support" to the Center, which it envisioned would evolve, under Hlatky's leadership, "into an internationally competitive program." The structure and terms of the contract, which Steward, a sophisticated entity, negotiated, involved more than contracting for Hlatky's labor.[8] Hlatky founded the Center

---

[8] Steward requested that the judge instruct the jury during the damages phase that, "[i]n employment cases, where, as in this case, the employment contract was for a fixed period of time, the employee is entitled to recover the unpaid balance of

before Steward acquired Caritas and, according to industry custom and Federal regulations, she could expect to be able to relocate the Center, its equipment, researchers, cell samples, and grant funding to another institution if she chose. Indeed, she did just that when she left Harvard for Caritas. When Steward entered into the contract with Hlatky, it was not only gaining the benefit of her employment, but also gaining the recognition and funding that flowed from the Center's Federal grants. The jury determined that Steward committed a breach of the contract by withdrawing support for the Center, and the judge further found that this breach foreseeably resulted in the destruction of Hlatky's life's work.

Steward's theory that Hlatky is entitled only to the salary and benefits she was promised under the contract, plus the out-of-pocket costs she incurred while trying, unsuccessfully, to save the laboratory, trivializes and misrepresents the loss that Hlatky truly suffered from its breach. If Steward had fulfilled its obligation to provide support to the Center, Hlatky reasonably would have expected, at minimum, to have at the end

---

her compensation for the remainder of the contract, less any amounts the employee earned or reasonably could have earned during that time." The judge declined to include this instruction in her final instructions to the jury, and Steward did not object to the final instructions, waiving any objection. See Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 559, cert. denied, 516 U.S. 931 (1995).

of the three-year contract access to a functioning, turnkey laboratory with the capacity to continue the cancer research that had become her life's work. Because of Steward's breach, Hlatky lost her laboratory, equipment and, most importantly, the cell samples -- the culmination of twenty-five years of work.

So while damages principles are difficult to apply in this case, the judge did not err in concluding that Hlatky personally suffered harm from the foreseeable destruction of her life's work. Nor did she err in concluding that the jury reasonably could have sought to restore Hlatky to the position she would have been in if Steward had complied with its obligations under the contract by awarding her the amount of money needed to reestablish a functioning cancer laboratory -- which, based on Hlatky's testimony, the judge determined to be $10 million.

This is consistent with the Pennsylvania Supreme Court's analysis in Ferrer v. Trustees of the Univ. of Pa., 573 Pa. 310 (2002), which is the only case identified by the parties or that I can find which presents circumstances roughly comparable to those in the instant case. In Ferrer, a tenured professor was sanctioned by the university in violation of university procedures, and prohibited from conducting certain research in his laboratory for two years. Id. at 315-316, 319. The university also informed significant funders of the professor's research about the sanctions. Id. at 330. As described by the

court, the effects of the sanctions were devastating -- Ferrer's research was completely shut down, his animal colonies were dismantled, his unique herd of cattle could no longer be maintained and had to be sold, and he lost significant future funding. Id. at 333. The jury found that the university's procedures concerning investigating misconduct were part of the terms and conditions of Ferrer's employment agreement, and that the university committed a breach of the agreement by imposing sanctions on Ferrer even though a formal investigation had concluded that he was not guilty of the alleged misconduct. Id.

A divided Pennsylvania Supreme Court found that Ferrer was not seeking damages for the loss of future funding by third parties or for lost salary or benefits; rather, he sought to recover damages arising from the university's prohibition against his conducting animal research in his laboratory for two years, which "resulted in the complete dismantling and destruction of his research program." Id. at 335. The court agreed with the trial court that Ferrer was entitled to expectation damages for the breach of contract "necessary to make [him] whole again for the loss of his research program," based on "evidence regarding the amount of money needed to restore [his] program to its preexisting level when the sanctions were imposed." Id. at 334. And it affirmed an award of damages of $2.9 million as the amount needed to rebuild the

research program.  Id. at 344.  There is no indication in the opinion that any restriction was imposed on Ferrer to ensure that he used the award of damages for this purpose.

Hlatky's claim for expectation damages in the amount needed to restore the Center's laboratory is even stronger than Ferrer's claim.  In Ferrer, the employment contract did not include a commitment by the university to provide support for Ferrer's research, and thus there was no alleged breach of that commitment.  Instead, the breach was the violation of university procedures that the jury found were incorporated as terms and conditions of Ferrer's employment agreement as a tenured professor.  See id. at 316.  Here, Steward failed to fulfill its contractual commitment to "provide support" for the Center's research, and Hlatky's claim for expectation damages arises directly from Steward's breach.

b.  Restriction on the award of damages.  I would, however, part ways from the Ferrer opinion in the form of the damages remedy allowed.  Hlatky did not seek damages for loss of future earnings, reputational harm, or emotional distress arising from the breach of contract.  Apart from the $200,000 she sought to reimburse her for the expenses she incurred in retaining a public relations consultant in a failed attempt to save the laboratory, Hlatky sought damages only for the loss of her expectation interest in the contract, "which is [her] interest

in having the benefit of [her] bargain by being put in as good a position as [she] would have been in had the contract been performed." Restatement (Second) of Contracts, § 344(a) (1981). Had she owned the laboratory, or any of its equipment, reagents, or cell samples, she could have sought the lost monetary value of the laboratory or its components. But she does not claim any such ownership interest.

Instead, she asked the judge and jury for the funds needed to put her in the position she would have been in if Steward had complied with its contractual obligation to "continue to provide support" to the laboratory -- the principal investigator of a functioning cancer research laboratory. With the remittitur ordered by the judge, $10 million of the $10.2 million in damages was awarded to put Hlatky in that position. But the award of damages allowed by the judge is presently without restriction. Nothing would prevent Hlatky from spending the $10 million on a house or a yacht rather than on the reestablishment of a cancer research laboratory. I do not suggest that she would do so; she testified that she would not.[9] But the fact remains that she could do so, and thereby put herself in a

---

[9] Hlatky testified that, with her lawsuit, she "is trying to recoup a lab." Later in her testimony, in answer to the question, "What are you seeking?", she replied that she "was seeking to restore a lab to some minimal-functioning place and to bring in funding that could allow [her] to do the kind of work" she had done before.

financial position she would never have been able to attain under the contract. Had the contract been honored, Hlatky, as principal investigator, could have sought to move the laboratory to another research institution, but she could not have sold the laboratory, its equipment, or cell samples to realize a personal financial gain.

If, however, the judge ensured that the $10 million is invested in the reestablishment of a functioning cancer laboratory or in support of comparable research, there would be no possibility that the award of damages would provide a financial windfall to Hlatky and it would be guaranteed that the award of damages would place her in roughly the same position she would have been in if Steward had honored its contract to support the laboratory. This was the theory of damages presented to the jury by Hlatky's counsel in closing argument, without objection by Steward,[10] and it is a theory that is

---

[10] Hlatky's counsel argued in closing:

"We know how much the lab cost to refit, if you take Dr. Hlatky's testimony as credible, and I think you should. We know how much money they had to do the research that they were doing. Okay? Dr. Hlatky said she planned to be in research for at least another six years. And I think that's enough data for you all to figure out how to put the wheels back on. Okay? Because that's what the goal is here and has always been here. This has never been about a windfall. And I think you've heard that term a couple of times. It's never been about a windfall. It's about trying to recreate a world where Steward hadn't abandoned Dr. Hlatky."

consistent with the judge's instructions to the jury regarding damages, which also were without objection.[11]

Just as form should follow function in architecture, so, too, should form follow function in law. In the unique circumstances of this case, to prevent the contractual expectation damages allowed by the judge from putting Hlatky in a position she would never have been in had the contract been honored, I would vacate the judgment, apart from the $200,000 awarded to compensate Hlatky for her out-of-pocket expenses, and remand the matter to the judge. I would direct the judge, in consultation with the parties, to fashion a form of judgment that would ensure that the remaining $10 million of the judgment (plus the prejudgment interest attributed to this amount) be devoted solely to the reestablishment of a functioning cancer laboratory or to support comparable cancer research. How that could best be accomplished, whether through the creation of a trust or another comparable vehicle, or through other means, I would leave to the sound discretion of the judge, preferably

---

[11] I also note that during the appellate oral argument, Hlatky's attorney declared that she "wants to use these funds to benefit the science, to drive the science, further her life's work in cancer research, without a doubt." When counsel was asked about there being no restriction as to how Hlatky could use the $10 million, he responded that it was simply "a function of an award of damages in contract law."

with the agreement of the parties.[12]  Only by doing so would Hlatky truly be placed in a position comparable to where she would have been but for Steward's breach.

I recognize that we have not before imposed such a limitation on the use of funds awarded in a breach of contract case, and that we might not need to do so again to ensure that justice is done.  But in the unique circumstances of this particular case, I believe that structuring the judgment to ensure that $10 million of the award of damages will be used by Hlatky solely for the purpose of reestablishing a laboratory or supporting comparable cancer research is the fairest and most appropriate outcome to this litigation.  As noted, Hlatky relied on Steward's commitment of support in deciding to remain at Steward rather than seeking to move the laboratory, and its grant funding, to other interested institutions.  While she did not "own" the laboratory or its equipment, she devoted herself entirely to its success and entered into a contract to protect her life's work.  And Steward did not just commit a breach of a contract term.  The jury also found that Steward committed a

---

[12] Justice Lenk, in her separate opinion, correctly notes that, if Hlatky's restored laboratory is to receive Federal funds, she could not be both the owner of the laboratory and its principal investigator.  See post at    .  That is among the reasons I give the judge broad discretion in fashioning an appropriate form of judgment, which potentially could include a commitment by Hlatky to transfer the funds to a nonprofit entity that would be the legal owner of the cancer research laboratory.

breach of the implied covenant of good faith and fair dealing. "[T]he implied covenant exists so that the objectives of the contract may be realized."  Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927 (2005).  Steward may not sign a contract which promises support, and instead withdraw that support and frustrate Hlatky's objectives of the contract -- security for her research, her laboratory, and her team -- without remedy.[13] Conceptually, requiring Steward to pay damages in order to rebuild a minimally functioning cancer laboratory is, in essence, nothing more than "you broke it, you fix it."[14]

Justice Lenk argues that the fact that Hlatky did not own the laboratory is irrelevant to her entitlement to damages and that she is entitled to compensation for the loss of the laboratory without any restriction on how she ultimately spends the money.  But ownership surely does matter here.  If Hlatky had owned the laboratory that Steward destroyed through its breach of contract, she would have suffered personal financial loss from the loss of her laboratory, and her expectation

---

[13] When asked why she entered into a contract with Steward, Hlatky testified that in "getting a contract, I wanted to assure that whatever the transition was, . . . I wanted to make sure I had security for my research, my team and my funding agencies."

[14] Similarly, because Steward is still paying damages, even if to be used for a specified purpose, the remedy I propose is not a form of specific performance.

damages would have included the fair market value of the lost laboratory, which might be approximated from the cost of reestablishing the laboratory.  In that hypothetical case, no restriction would be appropriate on the award of damages compensating her for her financial loss.  But where Hlatky did not own the laboratory, the loss of the laboratory was not a personal financial loss but instead the loss of the ability to be the principal investigator of that specific laboratory and to conduct the research that had become her life's work.  To put Hlatky in the position she would have been in had Steward honored her contract, she is not entitled to the restoration of financial loss as measured by the fair market value of the laboratory; instead, she is entitled under the contract only to the restoration of the laboratory in which she had conducted her research.  By granting her the $10 million in damages without restriction, the court is granting her a remedy she would have been entitled to only if she owned the laboratory.  And on the premise of granting her expectation damages, the court is putting her in a position that she would never have been in had Steward honored the contract.[15]

---

[15] Justice Lenk also contends that imposing this restriction on the award of damages would open "the Pandora's box of unknown future harm to the predictability of contract law."  Post at .  But the result of today's opinion, allowing a plaintiff in such circumstances to keep the award of damages without restriction, will pose a far greater risk of harm, especially to

2.  Sufficiency of the evidence of damages.  Steward argues
that, even if Hlatky could, in theory, recover damages for the
cost of reestablishing the Center's laboratory, the judge abused
her discretion in awarding Hlatky $10.2 million on remittitur
because, apart from the $200,000 in mitigation costs, the amount
is unduly speculative and not supported by expert opinion.  A
judge's determination regarding the amount of damages is
reviewed for an abuse of discretion.  See Twin Fires Inv., LLC,
445 Mass. at 424-425.  "[A] judge's discretionary decision
constitutes an abuse of discretion where we conclude the judge
made a clear error of judgment in weighing the factors relevant
to the decision, . . . such that the decision falls outside the
range of reasonable alternatives" (quotation and citation
omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Steward argues the judge erred initially in admitting in
evidence Hlatky's testimony that she needed $10 million to
rebuild the laboratory.  As earlier noted, the judge before
trial precluded Hlatky from testifying that the cost to
reestablish the laboratory was $10.2 million, where in her
deposition she rested that estimate on a calculation prepared by

research institutions.  It will treat principal investigators
who do not own their laboratories as if they did and allow them,
based on a successful claim of breach of an employment contract,
to be placed in a financial position they could never have
achieved under the contract.

Steward for another purpose in the bankruptcy action. But the judge expressly stated that she did not intend by her rulings to preclude Hlatky from presenting evidence as a lay witness regarding her consequential damages, provided that evidence was based on her personal knowledge. Then, on cross-examination, Steward's counsel asked Hlatky whether she had done anything to "identify the cost of specific items for starting up a lab" or to "price out what a build-out today would be." The judge ruled that these questions opened the door to Hlatky's testimony regarding the cost of reestablishing a comparable laboratory.

Whether opinion testimony from a lay witness should be admitted rests in the sound judicial discretion of the trial judge. See Menici v. Orton Crane & Shovel Co., 285 Mass. 499, 505 (1934). And whether counsel has opened the door to testimony, through his questioning, that might not otherwise be admissible is also within the sound discretion of the judge. See Commonwealth v. Quinn, 469 Mass. 641, 648 (2014); Commonwealth v. McCowen, 458 Mass. 461, 479 & n.15 (2010). Steward did not argue in moving to strike this testimony that the estimate was without foundation, seek a voir dire to test its foundation, or question Hlatky to examine its foundation. See Hastings Assocs. v. Local 369 Bldg. Fund, 42 Mass. App. Ct. 162, 173 (1997) (lay witness opinion testimony was properly before jury where defendant did not move to strike testimony as

being without foundation).[16]  Instead, Steward chose not to

address Hlatky's testimony regarding the $10 million estimate

during trial and now claims that it is insufficient to support

Hlatky's award of damages.  In these circumstances there was no

abuse of discretion in the judge allowing Hlatky to testify to

her estimate of the cost of restoring her laboratory after

Steward's counsel suggested by his question that she had failed

to "price out what a build-out today would be."

Steward also contends that determining the amount of money

needed to rebuild a laboratory is an inherently complex task

requiring expert testimony.  The judge did not err, however, in

finding that, even without expert testimony, the evidence was

sufficient to support the conclusion that it would cost $10

million to restore the laboratory to a minimal level of

---

[16] Indeed, it is not even clear that Steward objected to the admission of the $10 million estimate.  When asked on redirect examination about what she was seeking, Hlatky responded, "We needed $10 million to even get a functional lab together, get people together and try to redo these projects, and we wanted $24 million as future funding."  Steward's counsel objected after Hlatky mentioned the $24 million.  During the parties' discussion at sidebar, Steward's counsel stated that he was "a little concerned with this 24-million number that she just mentioned," which the judge proceeded to strike.  Counsel did not mention at sidebar an objection to the $10 million figure, nor did counsel object when Hlatky's counsel stated for the record that his "understanding of the ruling [on the objection] was that the lab piece was not stricken, but that the grant piece was."  We give Steward the benefit of the doubt in construing its objection to include both the $10 million and $24 million estimates.

functionality.  It certainly would have been preferable for Hlatky to offer expert testimony on this subject.  But we have held that "[a]n owner of real estate or personal property having adequate knowledge of his property may express an opinion as to its value."  <u>Southwick</u> v. <u>Massachusetts Turnpike Auth</u>., 339 Mass. 666, 668 (1959).  See Mass. G. Evid. § 701 note (2019).  This rule "does not rest upon [the owner] holding the legal title, but is based upon his familiarity with the characteristics of the property, his knowledge or acquaintance with its uses, and his experience in dealing with it."  <u>Blais-Porter, Inc</u>. v. <u>Simboli</u>, 402 Mass. 269, 272 (1988), quoting <u>Winthrop Prods. Corp</u>. v. <u>Elroth Co</u>., 331 Mass. 83, 85 (1954).  See also <u>Menici</u>, 285 Mass. at 504 ("Persons not owners but sufficiently familiar with the property in controversy to express an opinion upon its value have been allowed to do so though not regarded as experts").  We have extended this rule to corporate officers testifying as to corporate property when they have sufficient knowledge or familiarity.  <u>Winthrop Prods. Corp</u>., 331 Mass. at 85.  As the founder and director of the Center, Hlatky was sufficiently familiar with what would be necessary to reestablish her laboratory because she was the person who had established it in the first place.[17]

---

[17] In fact, Steward in its closing argument characterized Hlatky's role as "CEO of her lab" and "CEO of her company."

Additionally, as the judge noted, other evidence admitted at trial buttressed Hlatky's lay testimony that $10 million was a reasonable estimate of the cost to reestablish a cancer research laboratory.  The jury heard evidence that Hlatky spent $4 million in 2005 to purchase additional equipment and customize her laboratory when she moved from Harvard to Caritas.  The Center's administrative coordinator estimated that the replacement cost of only some of the equipment at the Center totaled $1.5 million.  The laboratory employed thirty staff at the time it closed, Hlatky's salary alone was $425,000 annually, and her contract with Steward provided that it would pay $323,000 annually for personnel and laboratory supplies.  This is in addition to evidence that Hlatky had been accumulating equipment for years which she brought with her from Berkeley to Harvard, to Caritas, and then to Steward.  When determining damages for a breach of contract, the plaintiff need not prove her damages with mathematical certainty, as long as the damages are not too remote, speculative, or hypothetical.  See Lowrie v. Castle, 225 Mass. 37, 51 (1916). See also Pierce v. Clark, 66 Mass. App. Ct. 912, 914 (2006).  The judge did not err in concluding that the $10 million figure was not too speculative to form the basis for an award.

3.  Remittitur.  Hlatky in her cross-appeal argues that the judge abused her discretion in ordering a new trial unless

Hlatky agreed to remit all but $10.2 million of the jury's award of damages of $22,637,500. She contends that remittitur was improper in this case because the jury's calculation is entitled to deference and the evidence introduced at trial clearly warranted a verdict in the amount awarded by the jury when one adds future operational costs to the cost of reestablishing the Center.

Under Mass. R. Civ. P. 59 (a), "[a] new trial shall not be granted solely on the ground that the damages are excessive until the prevailing party has first been given an opportunity to remit so much thereof as the court adjudges is excessive." The rule "does not require the judge to give the plaintiff the opportunity to remit only so much of the amount of the verdict as exceeds the maximum amount which the jury warrantably might have allowed." D'Annolfo v. Stoneham Hous. Auth., 375 Mass. 650, 661 (1978). The trial judge has the "discretion to fix the amount of remittitur to bring the verdict anywhere within the range of verdicts supported by the evidence." Id. at 662. Given this standard, it is not surprising that we rarely conclude that a judge abused her discretion in ordering a plaintiff either to remit an amount the judge deems excessive or proceed to a new trial. See Reckis v. Johnson & Johnson, 471 Mass. 272, 299 (2015), cert. denied, 136 S. Ct. 896 (2016), quoting Loschi v. Massachusetts Port Auth., 361 Mass. 714, 715

(1972) (abuse of discretion in grant of new trial "on the ground of excessive damages 'can so seldom be found that actual instances in which this court has set aside the action of the trial judge . . . are almost nonexistent, and it has repeatedly been stated that occasions when this court can do so are exceedingly rare'"). Applying this standard, the judge here did not abuse her discretion in ordering a new trial unless Hlatky accepted the remittitur of $10.2 million.

We do not know how the jury calculated the damages they awarded. The special verdict asked only for the total amount of damages, and did not ask them to specify how they reached that total. The judge found that an award of over $22 million in damages was "grossly disproportionate to the proven injury Hlatky suffered from the destruction of her life's work." The judge acknowledged that there was testimony that the Center had procured $30 million in Federal grants, and that some of that money remained after Steward's breach. But the judge ruled, and Hlatky concedes, that none of the Federal grant monies would go directly to Hlatky. The judge also rejected Hlatky's argument that, based on evidence at trial that it costs between $3.75 million and $4 million per year to operate the Center, and that Hlatky expected to continue her research for at least six years, the jury could have awarded her a substantial amount to continue to pay for the future operations of the Center. The judge

declared that such an award would be a windfall to Hlatky, because she was not entitled to recover for the cost of future operations.

The judge acted within her discretion in determining that the award of damages was excessive to the extent it exceeded the amount of Hlatky's out-of-pocket expenses and the amount she testified would allow her to reestablish a cancer research laboratory to some "minimal-functioning place." I also note the absence of any evidence in the record that a laboratory would need to be in operation for a number of years before it could reasonably apply for Federal funding, so there is no evidence that reestablishing a laboratory necessarily includes financial support for future operational expenses. See Ferrer, 573 Pa. at 341-343 (researcher whose laboratory was destroyed due to breach of contract could recover cost of rebuilding laboratory, which was not premised on future funding).

4. Prejudgment interest. Finally, Steward contends that the judge erred in allowing Hlatky's motion to amend the judgment pursuant to Mass. R. Civ. P. 59 (e) to award prejudgment interest from the date of the alleged breach, December 31, 2012, rather than from the date Hlatky filed her complaint. I agree that interest should run from the date the complaint was filed.

Under G. L. c. 231, § 6C, prejudgment interest on a judgment resulting from a breach of contract claim is calculated from the date of the breach or demand but, if that date is not established, interest runs from the date of the commencement of the action. Establishing the "date of an alleged breach is a question of fact for the trier of fact." Karen Constr. Co. v. Lizotte, 396 Mass. 143, 149 (1985). Where a trial has proceeded before a jury, neither the trial judge nor an appellate court may make such a determination. Id. If the judge does not instruct the jury to make a special finding as to the date of the breach, and the plaintiff fails to object to that omission, interest properly runs from the date of the complaint. Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 125-126 (1986).

Here, the jury were not asked in the special verdict in the liability phase of the trial to find the date of the breach. Nor were they asked to identify the term of the contract that was in breach or the nature of the breach; they were simply asked whether Steward had "breached any terms of the Contract." And Hlatky did not object to the absence of questions asking for more specific findings.

The judge, however, determined that the jury had implicitly found that Steward committed a breach of the contract on December 31, 2012, when it withdrew from SRSPC, because in her

jury instructions during the liability phase of trial she stated: "Now, Dr. Hlatky alleges that Steward Health Care LLC breached the contract when it resigned as the sole member of Steward Research & Specialty Projects Corporation on December 31, 2012." But this statement merely summarized Hlatky's theory of the case; the absence of objection to this statement cannot be deemed the equivalent of a stipulation regarding the date of breach. There is certainly evidence in the record to support a finding that Steward committed a breach of the contract on December 31, 2012, but the availability of evidence in the record "does not satisfy the requirement that the trier of fact establish the date for breach." Aimtek, Inc. v. Norton Co., 69 Mass. App. Ct. 660, 668 (2007). Nor is the date of breach crystal clear from the evidence. To be sure, Steward withdrew from SRSPC on December 31, 2012, but it did not withdraw its support from the Center on that date; it continued to make payroll and perform other obligations of the project administrator even when it no longer served in that capacity. The jury reasonably could have found that the breach occurred, not when Steward withdrew from SRSPC, but when it effectively withdrew its support for the Center.

The burden rests with the plaintiff to establish the date of breach. Where the plaintiff fails to request a special finding during a jury trial (or object to its omission), and

fails otherwise to meet that burden, prejudgment interest properly runs from the date the complaint was filed, which here was February 7, 2014.  See Deerskin, 398 Mass. at 125-126.

LENK, J. (concurring in part and dissenting in part, with whom Budd and Cypher, JJ., join).  I agree that Dr. Lynn Hlatky suffered personal harm due to the defendant's breach of contract, as well as its breach of the covenant of good faith and fair dealing.  I agree that her harm -- the loss of the benefit of her bargain with Steward Health Care System, LLC (Steward) -- was compensable by money damages.  I also agree that Hlatky properly was permitted to testify as to the costs of rebuilding the laboratory that she brought to Steward and that was necessary to sustain her cancer research.  The evidence at trial was sufficient to undergird the remittitur award of $10 million, the cost to rebuild a "minimal-functioning place," possibly allowing for requisite future grant funding and the resumption of Hlatky's once-vibrant research.

I write separately because I disagree with Chief Justice Gants's remedy, one that would control how Hlatky may spend the damages that were awarded her.  The Chief Justice acknowledges that his remedy is unprecedented, see ante at    , and arises from his concern that, because she did not own the laboratory itself, and testified that she wanted the money to rebuild the laboratory, it somehow would be an unfair windfall were Hlatky to be permitted to spend the money damages in any other way.  See ante at    .  The Chief Justice, moreover, is satisfied that the circumstances here are sufficiently unique so as to have no

effect on future cases.  See <u>ante</u> at    .   I disagree with him on both counts.

To begin, it is the Chief Justice's remedy itself that is unfair. So far as I can tell (and as the Chief Justice himself agrees, see <u>ante</u> at    ), those awarded money damages by a jury have never before been told by a court that they may spend the award only to restore what was lost.  Once a plaintiff's recognized loss has been assessed and measured by the finder of fact, and then transformed into fungible money damages, it has been for the plaintiff to decide how to spend that compensatory award of damages.  I see no good reason to depart from that well-established course by singling out for different treatment this distinguished woman, whose life's work as a scientist was derailed <u>by</u> a breached contract.  That breach resulted in the foreseeable loss of the laboratory necessary to sustain her work, and all of the experimental samples she had created. Whether she wishes to start again, whether she even could start again after so much time has passed and her faculty position has been lost, whether she wishes to use the money to fund different research or others' research in the same field, or whether she wants to hike the Appalachian trail -- these matters simply are not our concern.

The Chief Justice views this departure from the norm as warranted both because Hlatky did not own the laboratory itself,

and because, by testifying that she intended to rebuild the laboratory, she somehow waived the right to use the money damages awarded her in any other way. While I can see how her not owning the laboratory might be relevant to an argument that she has not herself been harmed and simply cannot have suffered compensable damage (a view that the Chief Justice and I both reject),[1] it has no evident connection to the scope of damages she may receive.

The Chief Justice seems to think, unsupported by treatise or case law, that this fact of nonownership distinguishes Hlatky's case from all other contract cases, and that it thereby implicates a fairness calculus, i.e., if she does not own the laboratory, she does not fully own the loss, and any money damages cannot really be fully hers. Fairness, as the Chief Justice sees it, requires that money awarded to her has to come with strings attached -- it can be spent only to rebuild the laboratory, or in support of "comparable cancer research," and, in the interim, must be held in some form of trust.[2] Yet there

---

[1] Compare Ferrer v. Trustees of the Univ. of Pa., 573 Pa. 310, 349-352 (2002) (Cappy, J., dissenting).

[2] The alternative limitation that the Chief Justice would impose on Hlatky's award of damages -- that it be used to support "comparable cancer research"-- is curious, at best. It has nothing to do with Hlatky's expectation damages. The Chief Justice indicates elsewhere that the measure of her personal damages is that amount of money necessary to restore her to the position she would have been in had Steward provided the support

is no requirement in the Restatement of Contracts, nor in our prior cases, that a plaintiff own the property at issue.  See Restatement (Second) of Contracts, § 344(a) (1981) (in breach of contract claim, plaintiff is entitled to damages to protect "h[er] 'expectation interest,' which is h[er] interest in having the benefit of h[er] bargain by being put in as good a position as [s]he would have been in had the contract been performed").[3] See e.g., Hadley v. Baxendale, 156 Eng. Rep. 145, 151-152 (Ex. Ch. 1854); Leland v. Stone, 10 Mass. 459, 462-464 (1813).

As the Chief Justice recognizes, see ante at    , far from being unique, the form of arrangement at issue here is typical

---

it had promised her -- being able to "continue her life's scientific work" at the "peak of her career" by having a functioning laboratory supported by grant funding.  See ante at . Even if the $10.2 million remittitur award were all that the evidence supports -- a questionable assumption in my view, given that she also expected a faculty position, support staff, researchers, the use of her irreplaceable cell samples, the ongoing money necessary to run the laboratory, as well as other "indirect costs," see ante at    n.1, it hardly would include supporting other "comparable cancer research."  Moreover, one readily could envision how the $10.2 million would be eroded by legal fees if this mandated alternative were invoked:  for starters, just what cancer research in fact would be "comparable"?  To be sure, however, Hlatky would be free to use her award of damages to support other cancer research of her choice, if she elected to do so.

[3] "Expectation damages for breach of contract include consequential damages, i.e., 'those that cannot be reasonably prevented and arise naturally from the breach, or which are reasonably contemplated by the parties.'"  Selmark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 545 (2014), quoting Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 762 (1993).

in scientific research.[4]  The sponsoring institution may "own" the laboratory for purposes of scientific neutrality in government-sponsored work, but it has no ability to control the use of the equipment and materials, to maintain custody of the laboratory, or to direct the researchers.  The laboratory is a creature of the principal investigator, and would not exist without her.

Nor is it in the least surprising that Hlatky testified, in support of her claim for money damages, as to the importance of the hoped-for rebuilding of her laboratory.  In order to establish the amount of damages she claimed, it was necessary (and typical) that she focus on the cost of such intended rebuilding, rather than -- even if relevant -- the immeasurable harm done to her cancer research resulting from the loss of her

---

[4] The principal investigator brings in grant funding based on her standing and reputation in the field, develops the laboratory using her knowledge, training, skill, and experience, hires and supervises the laboratory staff and subordinate researchers attracted by the principal's scientific standing and reputation, and is entitled to move all of this, along with any remaining grant funding, to any other institution she chooses. See ante at    .  See generally National Science Foundation, Proposal and Award Policies and Procedures Guide (Dec. 26, 2014), https://www.nsf.gov/pubs/policydocs/pappguide/nsf15001/gpg_print.pdf [https://perma.cc/RZ8Q-EBLM]; 2 C.F.R. § 200.56 (2014) (indirect facilities and administrative costs).  See also National Science Foundation, Indirect Cost Rates, https://www.nsf.gov/bfa/dias/caar/indirect.jsp [https://perma.cc/W3Z4-2RF3], NASA Grant and Cooperative Agreement Manual (Dec. 26, 2014, rev. Aug. 22, 2019), https://prod.nais.nasa.gov/pub/pub_library/srba/documents/Grant_and_CooperativeAgreement Manual.pdf [https://perma.cc/WP2L-GSCX].

laboratory.  That she did so testify does not operate as a form of waiver as to any other use of the awarded damages and in no way warrants the extraordinary limitation that the Chief Justice would impose.

I am not persuaded that the Chief Justice's remedy, a curious mixture of expectation damages coupled with partial specific performance,[5] is either necessary or appropriate.  "One cannot have damages for the breach of a contract, and a decree also for its specific performance.  Not because the remedies are inconsistent.  On the contrary, they are alternative." Perroncello v. Donahue, 448 Mass. 199, 204 (2007), quoting Slaughter v. La Compagnie Francaises Des Cables Telegraphiques, 119 F. 588, 588-589 (2d Cir. 1902), cert. denied, 191 U.S. 574 (1903).  See, e.g., Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 478-479 (1991); Sullivan v. O'Connor, 363 Mass.

---

[5] Specific performance "is usually granted in disputes involving the conveyance of land," which is considered unique and where money damages will not suffice to make a plaintiff whole.  McCarthy v. Tobin, 429 Mass. 84, 89 (1999).  "[U]nder traditional principles of contract law, courts normally do not enforce employment contracts with orders for specific performance."  Redgrave v. Boston Symphony Orch., Inc., 557 F. Supp. 230, 234 (D. Mass. 1983), quoting Loeb v. Textron, Inc., 600 F.2d 1003, 1023 n.34 (1st Cir. 1979), overruled on another ground, Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985).  See Restatement (Second) of Contracts, § 364(b), (c) (specific performance will be "refused if such relief would be unfair").

579, 583-584 (1973), discussing <u>Hawkins</u> v. <u>McGee</u>, 84 N.H. 114 (1929).

I also do not agree with the Chief Justice's view that the limitation on the damages awarded Hlatky is the only "fair" thing to do in this case. The circumstances here are on all fours with <u>Ferrer</u> v. <u>Trustees of the Univ. of Pa</u>., 573 Pa. 310, 334-335 (2002).[6] As in <u>Ferrer</u>, <u>supra</u>, I believe that Hlatky should receive the money damages the jury awarded, just as she would in any other case of breach of an employment contract.[7] Indeed, as the Chief Justice observes, see <u>ante</u> at    , Hlatky appears to have a much stronger claim to damages than did the professor in <u>Ferrer</u>. She suffered the loss of a laboratory that she created for her cancer research, and that she had built up over twenty-five years; she brought to Steward her laboratory, her research staff, and her irreplaceable cell samples, only to see it all destroyed through Steward's actions and failures to act. See, e.g., Poola v. <u>Howard Univ</u>., 147 A.3d 267, 272, 286-288 (D.C. 2016); Moncton <u>vs</u>. Argonne Nat'l Lab., No. 03-C-3989 (N.D. Ill. Feb. 14, 2005).

---

[6] In <u>Ferrer</u>, 573 Pa. at 334-335, money damages were awarded to compensate a professor for the costs of restoring his research laboratory and Federally-funded program, including research animals, to its level prior to the university's breach.

[7] Indeed, the Chief Justice correctly characterizes the contract here as "not merely an employment contract." See <u>ante</u> at    .

To be sure, while uncommon in the employment context,[8] Hlatky herself might have sought specific performance of the contract, requiring the defendant to provide her with "non-capital funds in the amount of $323,000 per year for a period of [three] years . . . to be used for recruitment of research personnel, laboratory supplies, animal expenses, and expenses required to support [her] research," as well as "to continue to provide support and suitable office space" for her Center of Cancer Systems Biology.  She did not do so, electing instead to pursue a damages remedy.  It is not for this court to second guess the plaintiff and to impose retroactively even a modified form of the road not taken.

Indeed, among the unintended consequences of the Chief Justice's novel hybrid remedy is this:  the Chief Justice justifies his remedy by its focus upon Hlatky not "owning" the laboratory, and by the avoidance of a purported windfall.  Yet the remedy, even if it were feasible, would render her the owner or beneficiary of any rebuilt laboratory made possible by the use of her funds.  Ironically, Federal funding requirements

---

[8] See Redgrave, 557 F. Supp. at 234, quoting Loeb, 600 F.2d at 1023 n.34.

generally do not permit such ownership by a principal investigator.[9]

Quite apart from these concerns, I am not at all confident that, if adopted here, the Chief Justice's hybrid remedy would be the "one-off" that he anticipates. There are at least nine teaching hospitals and more than sixty acute care hospitals in Massachusetts, as well as over one hundred colleges and universities. However well intentioned, the admixture the Chief Justice has devised is Solomonic only in the sense that splitting the baby becomes a real risk. That similar situations could well arise again in our research-rich environment is hardly unthinkable. See, e.g., Trustees of the Univ. of the D.C. v. Vossoughi, 963 A.2d 1162, 1179-1182 (D.C. 2009) (affirming award of damages for value of researcher's "life's work," conducted with grant funding, and rejecting contention that jury should be instructed that plaintiff did not have ownership rights in materials purchased with university funds);

---

[9] See, e.g., National Science Foundation, Prospective New Awardee Guide (Jan. 2018), https://www.nsf.gov/pubs/2018/nsf18033/nsf18033.pdf [https://perma.cc/Q94R-4UW3]; National Science Foundation, Grantee Standards, NSF 05-131 (July 2005), https://www.nsf.gov/pubs/manuals/gpm05 131/gpm5.jsp#510 [https://perma.cc/7N7A-3F9S]. Neither the Chief Justice nor I have expertise in the intricacies of Federal grants to laboratories; that being said, however, I rather doubt that a former owner or beneficiary of a laboratory, who then transferred her funds to a nonprofit entity to hold title, could thereby qualify to be the requisite neutral principal investigator.

Mossberg v. University of Or., 240 Or. App. 490, 492-493, 503-506 (2011) (professor sued university for money damages for destruction of laboratory and equipment he had acquired with Federal grants and brought with him to his new university, as well as additional equipment acquired through grants after his arrival).[10]

It is not doctrinal purity for its own sake that matters here; it is that settled expectations about fundamental legal concepts do have value. Contract law is based on predictability. Parties expect to get the benefit of their negotiated bargains and, with recognized exceptions few in number, to have the law enforce them. The prospect that reviewing courts will, at unanticipated times and on an ad hoc basis, craft and impose unique remedies that the parties did not envision hardly furthers needed predictability. Introducing unnecessary contractual uncertainty in an economy so heavily dependent as Massachusetts's is upon education, medicine, and technological innovation is simply not prudent.

For the reasons I have given, and because I would not open the Pandora's box of unknown future harm to the predictability

---

[10] See also Embury v. King, 191 F. Supp. 2d 1071, 1085-1087 (N.D. Cal. 2001), aff'd, 361 F.3d 562 (9th Cir. 2004); Tavolini v. Mount Sinai Med. Ctr., 984 F. Supp. 196, 208 (S.D.N.Y. 1997), aff'd, 198 F.3d 235 (2d Cir. 1999).

of contract law upon which contracting parties have relied for hundreds of years, I respectfully dissent.